THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BRYAN D. CASE, Defendant-Appellant.

Third District   No. 3—91—0784

Opinion filed June 29, 1993.

Kenneth D. Brown, of State Appellate Defender's Office, of Ottawa, for appellant.

Marc Bernabei, State's Attorney, of Princeton (John X. Breslin and Robert M. Hansen, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BARRY delivered the opinion of the court:

Following a jury trial, the defendant, 17-year-old Bryan D. Case, was found guilty of first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(2)). He was sentenced to a term of natural life imprisonment. The defendant appeals, and we affirm.

The evidence tended to establish that the body of the 15-year-old victim, Christy Doyle, the defendant's first cousin, was discovered on her bedroom floor by her brother, Wade Doyle, about 9 a.m. on Sunday, September 30, 1990. Christy had stab and slash wounds to her neck and upper body. Her purse and its spilled contents were found on the hallway floor outside the bedroom. Among the spilled contents were Christy's dental appointment card and two photographs. The defendant's fingerprints were found on these items.

Christy lived with her parents, Jim and Linda Doyle, and her brother Wade. The rear section of the Doyle house is two stories with an open garage area which faces an alley. Christy's bedroom and Wade's bedroom are on the second floor of the rear section of the house. The middle section is a single story containing the kitchen and a bathroom. The front section of the house is two stories, with a living room on the first floor and the parents' bedroom on the second floor.

Numerous witnesses testified at trial about the events of the weekend of the murder. Jim Doyle testified that he gave Christy permission to go out on Friday evening, but told her to be home by 11 p.m. She did not come home that evening. The next time Jim and Linda Doyle saw Christy was the next day at about 5:30 p.m. She was walking toward a Norco gas station with the defendant and another young man. Jim told Christy to be home at 11 p.m. that evening. Jim and Linda testified that Christy did not have a purse with her at that time.

Jim and Linda Doyle testified that they returned home about 9 p.m. Saturday evening. Their son Wade came home about 9:30 or 9:45 and went upstairs to bed. Wade was drunk, but he was not loud or combative. Linda went to bed about 10:30 p.m. She heard Christy come home and talk to Jim about 11 p.m. Jim testified that Christy came into the living room and told him she loved him. Jim was angry with Christy for not coming home the previous night. He noted that he and Linda had been having problems with Christy that fall. Jim told Christy that "this shit" had to stop. Christy told him she knew it had to stop and went to bed. Jim then fell asleep on the couch and did not awaken until the next morning. He did not lock the doors.

Jim and Linda Doyle further testified that they did not hear anything during the night. They awoke about 7:30 the next morning and drank coffee in the kitchen. Jim then went to the store, and Wade came downstairs and told Linda to check on Christy because she was covered with blood. Linda called 911 after checking on Christy.

Wade Doyle testified that he and a friend had gone fishing on Saturday. They drank three or four cases of beer during the day, and Wade was drunk when he returned to town that evening. He vaguely remembered being dropped off at a Pizza Hut restaurant about a block and a half from his home. A Pizza Hut employee testified that Wade came in about 8:30 p.m. and passed out while eating a pizza. After Wade later passed out in the restroom, the manager called the police. Officer Alan Beaber testified that he woke Wade and told him to leave. Although Wade staggered, he walked under his own power when he left.

Wade remembered getting home about 9:30 or 9:45 p.m. and going upstairs to bed. The next thing he remembered was waking about 8:30 or 9 a.m. and finding Christy's body.

Jeff Hanson, Christy's friend, testified that he spent most of Saturday afternoon with her. That evening, Jeff and Diana Henderson, another friend of Christy's, saw Christy at a park in town. Christy left the park about 10:50 and started walking home. Jeff said Christy

was upset and did not really want to go home because she and her father had to do some serious talking.

Brandi Tieman and Trisha Blackwood testified that they were with the defendant and Chuck McClure at Trisha's house on Saturday between 8:15 and 10:30 p.m. The defendant and McClure were drinking Southern Comfort and Kool Aid. The defendant was wearing a black T-shirt with a design and writing on the front. Sometime after 10:30 p.m., Brandi and Trisha drove the defendant and McClure to a Moose Lodge. Clifford Coffin testified that he saw the defendant and McClure at the Lodge about 11 p.m. that night. Coffin gave them a ride into town and dropped the defendant off in front of the courthouse.

Eva Simmons testified that she saw the defendant and McClure at the Norco gas station just after midnight on Saturday night. Eva then drove them around. At one point, she stopped and the defendant vomited. After they dropped off McClure, the defendant asked Eva to take him to Christy Doyle's house. Eva dropped him off about a half-block from Christy's. Eva saw the defendant walk toward the alley, and then she left. When she saw the defendant the next afternoon, he told her his sister had picked him up in the alley before he got to Christy's. Eva said that on Saturday the defendant was wearing a black T-shirt with writing on it.

Kathy Duvall testified that she lived about 1½ blocks from Pee Wee Creek. There is an alfalfa field northwest of her house. About 2:15 a.m. on Sunday, September 30, she was standing on her front porch when she saw a man running down the street toward Pee Wee Creek. He had dark, collar-length hair and was carrying something in his left arm. She thought he was wearing a light-colored shirt, dark pants, and tennis shoes, although she was not certain he was wearing a shirt. Duvall estimated that the man she saw was 5 feet 6 inches to 5 feet 7 inches and 150 to 170 pounds. After viewing a photograph taken of the defendant when he was arrested on October 13, 1990, Duvall said his hair was the same as the hair of the person she had seen running. However, she could not say whether the man she saw was the defendant.

Police officer Gary Swanson testified that at the time of the murder the defendant was 5 feet 7 inches to 5 feet 8 inches and weighed 150 to 160 pounds.

Esther Berryman testified that she worked at the Norco gas station during the morning of Sunday, September 30. About 2:30 or 2:45 a.m., she saw the defendant standing by the telephone booth outside the station. He appeared to be wet. He was shivering and his teeth

were chattering. Berryman said it was a cold and windy night. She asked the defendant if he wanted to come inside. He refused and said he had just called someone to pick him up.

Julie Elliot, the defendant's sister, testified that the defendant had been living with her and her husband in Chicago since June of 1990. Julie and the defendant went to Bureau County to visit relatives on Saturday, September 30, 1990. That morning, they first went to the Doyles' house, where they met their mother. They stayed about an hour. The Doyles were not home. Julie stayed at her grandmother's house on Saturday night. The defendant called her there about 2:40 a.m. and asked her to pick him up at the Norco station. Julie said the defendant was wearing a plain black T-shirt when she picked him up. He had her turn on the heat because he was cold. He told her he had been swimming at Captain Swift's bridge with Chuck McClure. Later, he told her he had fallen into Pee Wee Creek.

Julie also testified that her husband's grandmother's house, which was unoccupied but had some furniture and boxes of clothing in it, was several blocks south of the Doyle home. The defendant told Julie he went to that house on Saturday night.

Diana Henderson testified that she saw the defendant standing with others outside the Doyle house early Sunday afternoon following the discovery of the murder. The defendant said he guessed someone had killed Christy and related that the killer stabbed her across the throat, on her breast and stomach, and down her arms.

The State introduced several knives over the defendant's objection. One, a butcher knife that Jim and Linda Doyle identified as one they kept in a butcher block in their kitchen, was found by police on October 2, 1990, in an alfalfa field about 2½ blocks from the Doyle home. Linda discovered the knife was missing after learning that Christy had been killed with a knife. Human bloodstains were found on the knife's handle.

The other knives introduced by the State were: (1) a pewter knife found by a private citizen in a cemetery southwest of Pee Wee Creek on July 24, 1991; (2) a fillet knife found in an alfalfa field just north of Pee Wee Creek by a citizen on August 12, 1991, and Jim Doyle testified that this knife was similar to one he noticed missing in April of 1991 from the tackle box he kept in his garage; (3) a knife Jim Doyle purchased to replace the one missing from his tackle box; (4) two pewter knives that Jim Doyle kept in a sack in his garage; (5) another knife from the butcher block in the Doyles' kitchen which was still there on Sunday; and (6) a pocket knife taken from the defendant on

Monday, October 1, 1990. Also admitted into evidence without objection was a buck knife found in Wade Doyle's bedroom on Sunday.

Kevin Zeeb, a forensic serologist, testified that he compared bloodstains found at the scene to blood samples of the defendant, Christy, Jim, Linda, and Wade Doyle. His genetic marker analysis showed that the bloodstain on a comforter found next to Christy's body could have come from the defendant but not from the others. Over objection, Zeeb testified that the genetic marker characteristics of that blood were found in approximately 6.35% of the white population and 7.97% of the black population in the United States.

Zeeb further testified that two bloodstains on carpeting from Christy's room could have come from the defendant but not from the others. Again over objection, Zeeb testified that the genetic marker characteristics of the blood on one of the carpet stains were found in .52% of the white population and .124% of the black population, and that the characteristics of the blood on the other carpet stain were found in .0369% of the white population and .0109% of the black population.

Police investigators Gary Swanson and Randall Hansen testified about five interviews they had with the defendant.

The first took place in front of the Doyle home on Sunday, September 30. The defendant said he went to the Moose Lodge the night before and got home at 3 a.m. The defendant also said Christy's father was physically violent toward her when he was drunk.

The second interview took place the following day at the defendant's sister's apartment in Chicago. The officers noticed two cuts on the defendant's right index finger. He said he got them carrying studs at work that day. The officers took photographs of the cuts. The defendant also said Eva Simmons dropped him off at the Hitching Post about 1:30 a.m. on the night in question. From there, he walked to Pee Wee Creek, where he went into the water above his knees and splashed water on his face, trying to sober up. He then went to his sister's old house on Randolph Street and eventually went to the Norco station, where he called his sister to pick him up.

The third interview was conducted on October 10, 1990. The defendant was advised of his constitutional rights and waived them. When told by the officers that Eva Simmons would say she took the defendant to the Doyle residence and he told her he was going to stay all night, the defendant replied that Simmons was a "lying bitch." The officers also said that when they reviewed the evidence and asked the defendant why he killed Christy, the defendant did not respond.

The fourth interview took place on October 12, 1990. The defendant again waived his constitutional rights. He said he and his sister and mother were at the Doyles' house on Saturday morning of the weekend of the murder. The defendant said he had not touched anything from Christy's purse on that Saturday. Following this interview, the defendant was placed under arrest.

The defendant was interviewed a fifth time the following morning at the county jail, where he again waived his rights. Officer Swanson told the defendant they had a fingerprint from the contents of Christy's purse. The defendant was quiet. When Swanson told him cooperation would probably make a difference, the defendant said, "Life or death, what a difference, I would rather be dead."

Forensic pathologist Dr. Larry Blum testified that Christy died from blood loss due to multiple stab wounds to the neck and body above the waist. Blum opined that the butcher knife could have caused the neck wounds, but not the wounds to the chest and breast. He also opined that the pewter knife that was found in the cemetery and the fillet knife that was found in the alfalfa field could have caused the wounds he found on her upper body. Blum said it was unlikely that the defendant's pocket knife caused the two penetrating wounds to the chest and breast and that the knife found in Wade's room could have caused some of the wounds, but not the penetrating wounds. Blum also examined the photographs taken of the cuts on the defendant's right index finger on October 1, 1990. He opined that they were consistent with wounds received 42 to 43 hours earlier. He further opined that the cuts were older than 24 hours.

Frank Spurlock, the defendant's co-worker, testified that a door dropped on the defendant's right hand on Friday, September 28, 1990, leaving a red line across the first three fingers, but no blood. Spurlock said he did not then see the cuts as depicted in the photographs taken of the defendant's finger on Monday, October 1. On October 1, the defendant told Spurlock that he hurt his hand working with his brother-in-law. The defendant was angry later when Spurlock told him he had spoken to the police. The defendant then told Spurlock that he had told the police he hurt his hand on Thursday, moving studs on the job.

Among the witnesses that testified for the defendant was Jim Zawacki, who lived north of the Doyles' home. He said he was in his garage on the Saturday evening in question about 8:50 p.m. when Wade Doyle stopped to talk to him. Zawacki could not say that Wade was drunk.

Shirley Camp, who lived directly across the alley from the Doyles, testified that she was awakened at 3 a.m. on the night in question. She heard noises in the alley sounding like people walking down the alley talking to each other. She thought she heard two or more people. She later stated she could not tell if the voices were in the alley or the front or back of the house.

David Dalrymple testified that his house abuts the alley to the rear of the Doyles. His house is separated from the Doyles' by an east-west street and is approximately one block from the Doyle house. Dalrymple said he arrived home just before 3 a.m. on the night in question. He said he heard Wade's voice coming from the alley near the Doyles' house. He had the impression that there were two people in the alley because they were laughing and yelling as if they were drunk. Dalrymple admitted that he had been drinking at a local bar and was intoxicated. Finally, Dalrymple testified that on January 5, 1991, Wade told him it would be better for everyone if Dalrymple did not testify that he saw Wade in the alley at 3 a.m. Wade had denied being in the alley behind his house at 3 a.m. that Sunday morning.

The defendant's brother-in-law, Scott Elliott, testified that the defendant began living with Elliott and his wife Julie in Chicago in July of 1990. Elliott got the defendant a job as a construction worker. Elliott said cuts like the defendant had on his finger were common in the construction trade. Elliott also said the defendant was not to stay at Elliott's grandmother's house in Bureau County, where Elliott and Julie lived before moving to Chicago. The defendant had stayed there several times in the spring, and Elliott's father was upset about it. Elliot would have sent the defendant home if he violated the rules, just as he had two years before when the defendant lived with them.

The defendant testified he was very familiar with the layout of the Doyles' house and he usually entered through the garage. On the Saturday morning in question, he and his sister went to the Doyle home to meet their mother. While there, he noticed a purse on the kitchen table. He saw two photographs and a bunch of other items in a pile next to the purse. He picked up the pictures because he recognized the people in them, Dave Dalrymple and Wade Doyle. The defendant did not pay particular attention to anything else he may have touched on the table. He then went upstairs to see if Christy or Wade was home.

The defendant also said he shot pool at the Hitching Post early Saturday evening with Chuck McClure. Afterwards, he and Chuck walked to Pizza Hut, where they saw Christy. The three of them then

walked to the Norco station. After Christy's parents stopped and talked to her, Christy left.

Later that evening, the defendant and Chuck drank some Southern Comfort at Trisha Blackwood's. From there, they went to the Moose Lodge, where they met Clifford Coffin. After Coffin gave them a ride into town, Chuck made a call at the Norco gas station. They then got into Eva Simmons' car and rode around with her. After the defendant threw up near a park and Chuck left, Eva dropped him off behind Pizza Hut. He then walked to his brother-in-law's old house, climbed through a window, and tried to go to sleep. He was unable to fall asleep, so he walked to the Norco station and called his sister. When she picked him up, he was wearing the same clothes he had worn since the morning, including a plain black T-shirt.

The defendant further testified that he was not in the Doyles' house on Saturday night, and he denied killing Christy. He also said Diana Henderson had lied regarding his statements concerning Christy's wounds following the murder. He admitted he did not tell the police the truth about his whereabouts on Saturday night. He explained that he did so because he had gone to his brother-in-law's house, and he was afraid if Elliott found out, he would kick the defendant out of the apartment in Chicago, and he would lose his job. He said he had no idea where he got the cuts on his finger. In an effort to be helpful, he gave the police several different explanations as to how he could have received the cuts on his construction job. The defendant said he was silent when the police accused him of killing Christy because he was scared and because he was exercising his right to remain silent.

Dr. Robert Kirschner, a forensic pathologist and deputy chief medical examiner of Cook County, testified that he reviewed the autopsy report prepared by Dr. Blum. Kirschner agreed the butcher knife could have caused Christy's neck wounds. He said it was unlikely that the defendant's pocket knife caused the wounds to the neck and sternum. He opined that it was unlikely that the pewter knife that was found in the cemetery caused the wound to the sternum, but this wound could have been caused by the knife Jim Doyle said he purchased after Christy's death. Kirschner also testified that Wade's buck knife could have caused the wounds to the sternum, the right breast, and the right armpit.

In rebuttal, Jim and Linda Doyle testified that they had not seen Christy's purse on the kitchen table at any time on Saturday. Also, Dan Gotherd testified that between 2:30 and 3 a.m. on Sunday morning, he and two friends were walking through the alley near Dalrym-

ple's house. They were drunk, laughing, and goofing around. He did not see Wade Doyle in the alley.

On appeal, the defendant's first issue is whether he was denied a fair trial by the admission of expert testimony concerning the percentage of the population which could have made the bloodstains which were compatible with the defendant's blood. The defendant argues that the statistics failed to sufficiently limit the number of possible donors and gave the jury a false impression of precision in the measurement of his guilt. The defendant also complains that the prosecutor improperly commented about the probability that the bloodstains were contributed by someone other than the defendant.

Initially, we note that the admissibility of evidence is a matter within the sound discretion of the trial judge, whose decision will not be reversed absent a clear abuse of discretion. Such an abuse of discretion exists only where the trial judge's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial judge's view. *People v. Illgen* (1991), 145 Ill. 2d 353, 583 N.E.2d 515.

In making his argument, the defendant relies primarily on *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734. In *Harbold*, the State's expert witness testified that, based on the characteristics of the blood samples taken from the victim, the defendant, and the scene of the homicide, the probability of an accidental match between the defendant's blood and blood samples taken from the scene was less than 1 in 500. On review, the appellate court held that the trial court erred in admitting the testimony regarding the statistical probability of matching blood because of a lack of foundation and because it encouraged the jury to focus "unfairly upon a numerical conclusion." Because *Harbold* involved a close circumstantial case, the cumulative effect of this error and three other errors was deemed sufficient to warrant a new trial.

■ We find *Harbold* to be distinguishable. Here, Zeeb merely testified that the defendant's genetic marker characteristics in the three samples were found in certain approximate percentages of the population. He did not testify about the chances of finding a person at random in the population with these genetic markers in his blood or about the probability of an accidental match. Furthermore, Zeeb admitted that while he could positively exclude someone as the source of the bloodstain, he could not positively include someone. Under these circumstances, we find that the trial judge did not abuse his discretion in allowing the admission of Zeeb's testimony. (See *People v. Phillips* (1987), 159 Ill. App. 3d 483, 511 N.E.2d 1193; *People v. Redman* (1985), 135 Ill. App. 3d 534, 481 N.E.2d 1272; *People v. Miles* (1991),

217 Ill. App. 3d 393, 577 N.E.2d 477.) In each of the foregoing cases, testimony concerning evidence very similar to that adduced in the instant case was held to be properly admissible.

Regarding the prosecutor's complained-of remarks, we find that for the most part he merely properly restated Zeeb's testimony. Additionally, the prosecutor commented that the percentages of white people included every white person, such as babies, people in hospitals, and people in nursing homes, and that when those people were excluded, the percentages would be even lower. We find that the jury could have reasonably inferred what the prosecutor suggested and therefore his remarks were not improper.

Further, assuming *arguendo* that the expert testimony was inadmissible, the remaining evidence against the defendant, although circumstantial, was simply overwhelming. We note that whether evidence is direct or circumstantial, the same reasonable doubt standard applies on appeal. (*People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344.) Additionally, there is no legal distinction between direct and circumstantial evidence as to the weight and effect thereof. *People v. Robinson* (1958), 14 Ill. 2d 325, 153 N.E.2d 65.

Here, it was established that the defendant had access to the victim's home and knowledge of its layout. His fingerprints were found on items that had been in her purse. His testimony concerning how they got there was contradicted by the victim's parents. Furthermore, he told police that he had not touched anything from the victim's purse on that Saturday. Several witnesses placed him near the scene at the time of the murder. One witness described a man fitting the defendant's description running in the area toward Pee Wee Creek. The defendant told conflicting stories concerning whether and how he got wet. Witnesses described the defendant as wearing a black T-shirt with a design and writing on it, but no such T-shirt was ever found. However, the defendant admitted that he had entered his brother-in-law's grandmother's home on the night in question, and his sister testified that there were boxes of clothes in the home. Thus, the jury could have reasonably inferred that he had changed his shirt there.

Additionally, the defendant told police several different versions of his whereabouts on the night of the murder. He also told several inconsistent stories concerning how he got the cuts on his finger. Moreover, Dr. Blum testified that the cuts could have been made about the time of the murder. Also, Diana Henderson's testimony showed that the defendant knew the details of the victim's wounds soon after the discovery of the victim. The defendant's only response to her testimony was that she was lying. Finally, the jury could have reasonably

inferred that the defendant's responses to the police accusations of guilt were not those of an innocent person. We concur with the trial judge's assessment that this was an extremely strong case of circumstantial evidence. Consequently, we find the admission of the expert testimony did not prejudice the defendant.

The defendant next argues that the eight knives, other than Wade Doyle's buck knife, were improperly admitted into evidence. He contends that none of the knives was sufficiently linked to the defendant or to the murder.

Physical evidence is admissible if there is proof to connect it with the defendant and the crime. (*People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218.) The proof of the connection of the physical evidence to the crime and the defendant may be circumstantial, and the determination of admissibility is within the judge's discretion. *People v. Hoffstetter* (1990), 203 Ill. App. 3d 755, 560 N.E.2d 1349.

In the instant case, we note that three knives were admitted into evidence without limitation. They were: (1) the butcher knife found two days after the murder in an alfalfa field about 2½ blocks from the victim's home—Jim and Linda Doyle identified it as one missing from their kitchen following the murder; (2) a pewter knife found on July 24, 1991, in a cemetery with an entrance one-half block southwest of the Pee Wee Creek tube, and which Jim Doyle testified looked like one of his knives; and (3) a fillet knife found in an alfalfa field in the area of Pee Wee Creek on August 12, 1991. Jim Doyle identified it as similar to one he had noticed missing from the tackle box in his garage in April of 1991. Thus, there was evidence that these knives were at the Doyle house at the time of the murder.

Additionally, Dr. Blum testified that the butcher knife could have caused the victim's neck wounds, and the pewter and fillet knives could have caused the wounds on her upper body. Thus, these knives were relevant as the possible murder weapons. Furthermore, other evidence established that the defendant was familiar with, and had easy access to, the victim's home. That the defendant was not connected with the knives by direct evidence goes to weight, not their admissibility. (*People v. Hoffstetter* (1990), 203 Ill. App. 3d 755, 560 N.E.2d 1349.) We hold that the trial judge did not abuse his discretion in allowing these knives into evidence.

As for the remaining five knives, we note their connection to the murder and to the defendant appears to be more tenuous. However, we need not analyze whether they were properly admitted for the limited purposes stated at trial. We find that any error in their admission

was harmless given the overwhelming nature of the remaining evidence, as discussed above.

Finally, the defendant argues that the trial judge abused his discretion in sentencing him to natural life imprisonment. He asserts that adequate consideration was not given to mitigating factors such as his youth, his drug and alcohol use, his lack of criminal history, his unhappy family background, and his positive employment history.

■ Sentencing is a matter of judicial discretion and absent an abuse of that discretion by the trial court, a sentence may not be altered on review. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) A proper sentence must be based upon the particular circumstances of each case. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) A trial judge is not required to enumerate each factor he considered in arriving at the sentence. (*People v. Duncan* (1990), 196 Ill. App. 3d 343, 553 N.E.2d 774.) A trial judge is in a better position than the appellate court to consider the defendant's credibility, demeanor, and moral character in arriving at a sentence. *People v. Thompson* (1990), 200 Ill. App. 3d 23, 557 N.E.2d 1008.

When mitigating evidence is before a judge, it is presumed he considered it, absent an indication other than the sentence imposed to the contrary. (*People v. McCarthy* (1991), 213 Ill. App. 3d 873, 572 N.E.2d 1219.) A trial judge need not give a defendant's rehabilitative potential more weight in the sentencing decision than he gives the seriousness of the offense. *People v. Brown* (1991), 218 Ill. App. 3d 890, 578 N.E.2d 1168.

Here, the trial judge stated that he had considered the entire pre-sentence report. Thus, he was well aware of the factors the defendant claims were mitigating. However, the judge noted the 20 knife wounds sustained by the victim and found that the instant murder constituted exceptionally brutal or heinous behavior indicative of wanton cruelty. He also found that the defendant lacked remorse. Lastly, the judge noted that while the defendant had no prior convictions, he had a very violent past.

The record reveals that in December of 1987, the defendant was suspended from school for pulling a knife and threatening a female student. The student testified that the defendant brought the knife to her neck. He was suspended on another occasion for possession of a razor blade. In December of 1987, he threw another student into the side of a bus, causing a detached retina. He was suspended from school for the rest of the year on May 23, 1988, because he presented a risk of physical danger to others. On May 4, 1989, he threatened to physically harm a staff member at the Nachusa Lutheran Home. On

May 8, 1989, he attacked another student there, and he physically fought with a staff member there on September 28, 1989. The defendant was also discharged four days early from the Rosecrance Center on June 28, 1990, for aggressive actions toward another student.

Based on the circumstances of the offense, the defendant's character, and the need to protect society, we find no abuse of discretion by the trial judge in sentencing the defendant.

For the foregoing reasons, the judgment of the circuit court of Bureau County is affirmed.

Affirmed.

McCUSKEY, P.J., and STOUDER, J., concur.