JOHN HILGENBERG *et al.*, Plaintiffs-Appellants, v. ROBERT KAZAN *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—97—2912

Opinion filed May 10, 1999.—Rehearing denied June 11, 1999.

David J. De Jong & Associates, Ltd., of Chicago (David J. De Jong, of counsel), for appellants.

Gessler, Hughes & Socol, Ltd., of Chicago (David J. Pritchard and Alex W. Miller, of counsel), for appellees Robert Kazan and West Suburban Neurosurgical Associates, S.C.

Bresler, Harvick & Glenn, Ltd., of Chicago (Thomas M. Harvick and Martin B. Bresler, of counsel), for other appellees.

JUSTICE GALLAGHER delivered the opinion of the court:

This is a professional negligence action brought by John Hilgenberg and his wife, Joyce Hilgenberg (plaintiffs), against Robert Kazan M.D.; West Suburban Neurosurgical Associates, S.C.; John Garino, M.D.; George Katele, M.D.; and Suburban Anesthesiologists, S.C. West Suburban Neurosurgical Associates, S.C., is the professional corporation of Dr. Kazan, the neurosurgeon who performed John Hilgenberg's (plaintiff's) surgery. Suburban Anesthesiologists, S.C., is the professional corporation of Drs. Garino and Katele, the anesthesiologists for plaintiff's surgery.

Plaintiff underwent cervical spine surgery (posterior hemilaminectomy) for a herniated intervertebral disk on October 31, 1991. Following the surgery, defendants became aware that plaintiff suffered a spinal cord injury—infarction, "central cord syndrome" or stroke. On November 26, 1996, the jury returned a verdict in favor of all defendants. Plaintiffs timely filed a posttrial motion that was denied on July 18, 1997. This appeal was timely filed against all defendants, but both issues raised by plaintiffs involve defendant Kazan's defense and not defendants Garino and Katele. We affirm.

At the time of the surgery, plaintiff was a 38-year-old male who had been an insulin-dependent diabetic since early adulthood. He underwent cervical spine surgery (posterior hemilaminectomy) for a herniated intervertebral disk which was performed by Robert Kazan (defendant Kazan), M.D., a neurosurgeon. Anesthesia was administered by John Garino, M.D., and George Katele, M.D. Preoperatively, plaintiff enjoyed normal spinal cord function. The cervical spine surgery was considered low risk and full recovery was anticipated.

During the surgery, plaintiff suffered a vascular insufficiency which caused a discrete part of his spinal cord to die at the level of surgery. Anatomically the damaged spinal cord consisted of two columnar-shaped areas of dead tissue located in the center portion of the "butterfly"-shaped gray matter of the spinal cord, slightly toward the front, one column on each side of the midline. The remainder of the butterfly-shaped spinal cord gray matter, together with the white matter located toward the periphery of the spinal cord, was completely unaffected. Each column of destroyed spinal cord tissue measured approximately 3.8 centimeters (1.5 inches) in length and 2 to 3 millimeters in width. These two dead areas of anterior spinal cord gray matter extended from the level of the fifth to the seventh cervical vertebrae, with the site of surgery, therefore, near the center of the length of each column.

Plaintiffs contended at trial that during the 1991 surgery, defendant Kazan negligently overmanipulated the spinal cord in a direct, mechanical fashion. Plaintiffs argued that the direct spinal cord manipulation by defendant Kazan, combined with a second factor, low intra-operative blood pressure in the patient, proximately caused the spinal cord damage in the plaintiff. Alternatively, plaintiffs argued the theory of *res ipsa loquitur*. It was undisputed at trial that spinal cord infarction had occurred and that the spinal cord infarction had resulted in severe motor deficits and muscle wasting in both of plaintiff's hands and forearms.

The defense theorized that plaintiff's insulin-dependent diabetes had put him at high-risk for the development of the spinal cord injury which he in fact suffered. To that end, defendants argued that it was plaintiff's diabetes, rather than the negligence of the defendants, which offered the best explanation for his damages.

Dr. Charles D'Angelo, an expert witness for defendant Kazan, is a board-certified neurosurgeon at Rush-Presbyterian-St. Luke's Medical Center. During his career, Dr. D'Angelo has performed between 500 and 1,000 cervical disk surgeries. Dr. D'Angelo's opinions in this case were based in part on his review of plaintiff's medical records. Dr. D'Angelo testified that defendant Kazan did not strike or retract the spinal cord during the surgery. Based on a myelogram and CT scans done before surgery, Dr. D'Angelo concluded that defendant Kazan had ample room to remove the disk without any increased risk to the spinal cord. He also found no indication from either the operative report or the anesthesia report that defendant Kazan had retracted the spinal cord during surgery. Dr. D'Angelo testified that whenever the spinal cord is struck, there is always a characteristic and dramatic rise in the patient's blood pressure. Dr. D'Angelo reviewed plaintiff's anesthesia record and noted that nowhere on the record was there a dramatic rise in plaintiff's blood pressure. Based on the absence of a rise in blood pressure on plaintiff's anesthesia record, Dr. D'Angelo concluded that defendant Kazan had not struck or retracted the spinal cord.

Dr. D'Angelo also reviewed plaintiff's postoperative MRI scans and testified that it was impossible for defendant Kazan to have injured the spinal cord in the manner plaintiffs alleged. Dr. D'Angelo observed that there was no blood nor any bone chips or fragments of disk in the area of the surgery. In fact, nothing had been disrupted in the area of the surgery that would even hint that the surgery caused an injury to the spinal cord.

Dr. D'Angelo also testified regarding plaintiffs' *res ipsa loquitur* allegation, stating that "the problem that [plaintiff] suffered can hap-

pen definitely in the absence of negligence and has happened to others, including myself, without any evidence of negligence." Dr. D'Angelo based his opinion in part on a couple of his patients who suffered similar injuries after surgery.

The 60-day rule of Supreme Court Rule 218(c), requiring completion of discovery 60 days prior to trial, was waived by all parties on April 2, 1996. 166 Ill. 2d R. 218(c). On August 8, 1996, plaintiffs' counsel received defendant Kazan's Rule 213 answers identifying Dr. Ducker as a retained opinion witness and disclosing his opinions. 166 Ill. 2d R. 213. Dr. Ducker, a neurosurgeon, entered neurosurgical training in 1965 and was board certified in 1971. At the time of the trial, he practiced and taught at Johns Hopkins University in Baltimore, Maryland. Dr. Ducker has extensive experience in posterior laminectomies, the surgery defendant Kazan performed on plaintiff. Dr. Ducker performs between 15 and 20 posterior laminectomies per year.

The only proximate cause opinion disclosed by Dr. Ducker under Rule 213 was that the conduct of defendant Kazan had not proximately caused plaintiff's damages. On August 13, 1996, prior to Dr. Ducker's deposition, plaintiffs filed their motion to bar Dr. Ducker from testifying to any affirmative proximate cause opinions at deposition or trial based on defendant Kazan's Rule 213 disclosure. However, before the motion was heard, defendant Kazan updated Dr. Ducker's opinions pursuant to Rule 213 disclosing specific and affirmative proximate cause opinions. The update also indicated that Dr. Ducker would base his opinions on the article he co-authored entitled, "Posterior Cervical Laminoforaminotomy for Radiculopathy: Review of 172 Cases," which appeared in the medical journal, *Neurosurgery*, Vol. 33, No. 3, September 1993.

This article constituted a review of Dr. Ducker's experience with posterior hemilaminectomies, which at that time amounted to over 170 cases. Notably, Dr. Ducker wrote about a patient who underwent a posterior laminectomy procedure and later experienced a central cord syndrome similar to that experienced by plaintiff. After his patient suffered central cord syndrome, Dr. Ducker reviewed all of his cases to see if other complications had been overlooked. Dr. Ducker found that the only complication in his series was the one patient with central cord syndrome. Dr. Ducker first looked for the obvious possible causes, such as low blood pressure, trauma from the surgical instrument or trauma after the surgery. Dr. Ducker found none of these factors. Because his patient was an insulin-dependent diabetic, Dr. Ducker concluded although the "exact cause of the event is unknown, vascular insufficiency in conjunction with diabetes may offer the best explanation for this occurrence."

On August 28, 1996, plaintiffs requested that certain specific, medically related records of this patient be produced to plaintiffs prior to Dr. Ducker's deposition in this case. This discovery request was premised on plaintiffs' right to fairly cross-examine Dr. Ducker concerning the history of the patient in his article. Dr. Ducker refused to produce the patient's records, even if the patient's name was redacted, raising the physician-patient privilege as a bar to disclosure.

In a discovery motion on September 11, 1996, plaintiffs moved to bar Dr. Ducker from testifying as the deposition was two days away and plaintiffs had not received the medical records of Dr. Ducker's patient. Pursuant to this motion, the court effectively barred Dr. Ducker from any substantive reference to the insulin-dependent diabetic patient in his article as follows:

> "Dr. Ducker is barred from relying upon, or using as a basis for any opinion, any facts and circumstances relating to the diabetic patient who suffered the central cord syndrome, as set forth in his article disclosed in discovery in this case, unless the medically related record and x-rays of said patient are timely produced prior to Dr. Ducker's deposition."

Plaintiffs' counsel took Dr. Ducker's deposition on September 13, 1996. The medically related record and X rays had not been produced. In reliance on the court order of September 11, 1996, plaintiffs did not conduct a substantive inquiry concerning the diabetic patient referred to in the article.

On October 9, 1996, defendants moved for reconsideration of the September 11, 1996, order limiting Dr. Ducker's testimony. The court adhered to its prior ruling with the minor modification that, as to the diabetic patient, Dr. Ducker would be allowed to testify at trial only "that on one occasion he has seen central cord syndrome following diskectomy." Anything else, including any reference to the patient's diabetes, was barred.

Hearings on motions *in limine* commenced before the trial court on October 25, 1996. One of plaintiffs' motions *in limine* asked the trial court to reaffirm the prior rulings of the pretrial judge regarding Dr. Ducker's patient. The motion was granted, allowing Dr. Ducker to testify only that he had "investigated and published" on the phenomenon of central cord syndrome. He was again barred from going into any of the specifics relating to the diabetic patient in the article.

While plaintiffs had relied on the doctrine of *res ipsa loquitur* in their initial complaint filed on September 17, 1993, they had not produced any witnesses who had opinions as to this evidentiary theory. On October 29, 1996, however, the court permitted plaintiffs to file amended Rule 213 answers relating to their *res ipsa loquitur* the-

ory. On November 4, 1996, defendant Kazan filed his Rule 213 response to *res ipsa loquitur*, and he disclosed that part of Dr. Ducker's opinion was based on the article he authored and, specifically, the diabetic patient. The response did not disclose any new facts or opinions regarding the patient beyond those contained in the article. The trial commenced on November 4, 1996.

On November 18, 1996, defendant Kazan filed a motion to reconsider the court's ruling on plaintiffs' motion *in limine*. On November 20, 1996, immediately before Dr. Ducker took the stand, defendant Kazan supplemented his motion to reconsider. The trial court heard additional argument and at that point reversed its prior ruling and permitted Dr. Ducker to refer to the contents of the article concerning the diabetic patient. The court ruled, over plaintiffs' objection, that this testimony would be admitted as a basis for Dr. Ducker's opinions solely and for the limited purpose of rebutting plaintiffs' theory on *res ipsa loquitur*. Up to this time, any and all references to specifics regarding the diabetic patient in the article had been barred both by the trial court and by the pretrial judge.

At trial, Dr. Ducker testified that he had reviewed plaintiff's anesthesia record and postoperative MRI films and concluded that neither supported plaintiffs' theory of injury. The anesthesia report recorded plaintiff's blood pressure during the surgery and showed that there had not been low blood pressure during the surgery as alleged by plaintiffs. The MRI films taken after the surgery were inconsistent with plaintiffs' theory that defendant Kazan struck the spinal cord. The films showed an injury only to the interior, or grey matter, of the spinal cord. Dr. Ducker testified that if defendant Kazan had struck and injured plaintiff's spinal cord, there would also have been damage to the outer layer, or white matter, of the cord. The absence of white matter damage supported Dr. Ducker's opinion that the most likely explanation for plaintiff's injuries was a lack of blood flow at the level of the smallest blood vessels, not defendant Kazan striking or manipulating the spinal cord.

Dr. Ducker also testified that he did not believe anyone knew how injuries like plaintiff's were caused. He stated "[o]ur best theory is it's got to be tied to the diabetes and it's got to be tied to collateral vascular failure of some type to the cord." Plaintiffs' counsel cross-examined Dr. Ducker extensively on all issues raise by Dr. Ducker's direct testimony, including the diabetic patient and the article.

Defendant Kazan's counsel made numerous statements about diabetes during opening statement. He included details such as the fact that, in diabetics, there is a failure or death of the cells of the pancreas. He also alluded to the difference between insulin-dependent diabetics and non-insulin-dependent diabetics.

Plaintiffs raise the following issues on appeal: (1) whether a new trial is compelled because of the unfair prejudice suffered by plaintiffs in connection with the testimony of the defense retained opinion witness, Dr. Ducker, concerning his own insulin-dependent diabetic patient; and (2) whether a new trial is compelled because defense counsel made statements about diabetes in opening statement in bad faith, which were unsupported by any evidence at trial and which caused prejudice to plaintiffs.

The first issue plaintiffs bring regarding Dr. Ducker's testimony involves their entitlement to fully discover the medical records of Dr. Ducker's patient. Failing that, plaintiffs argue, any reference at trial to this patient should have been barred.

■ Initially, we note that the admissibility of evidence is a matter within the sound discretion of the trial judge, whose decision will not be reversed absent a clear abuse of discretion. *People v. Case*, 246 Ill. App. 3d 566, 573, 616 N.E.2d 601, 607 (1993); *Pickering v. Owens-Corning Fiberglas Corp.*, 265 Ill. App. 3d 806, 823, 638 N.E.2d 1127, 1139 (1994) ("[c]onsiderable latitude is permitted during discovery, and the trial court has broad discretion in ruling on discovery matters"). Such an abuse of discretion exists only where the trial judge's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the trial judge's view. *Case*, 246 Ill. App. 3d at 573, 616 N.E.2d at 607. An affirmative showing of abuse must be clearly shown. *Mistler v. Mancini*, 111 Ill. App. 3d 228, 233, 443 N.E.2d 1125, 1129 (1982).

■ When plaintiffs resurrected their *res ipsa loquitur* claim shortly before trial, the court properly allowed defendant Kazan to supplement his Rule 213 disclosure to respond to this theory. Defendant Kazan's expert, Dr. Ducker, had already been disclosed along with his opinions and the bases of these opinions. In addition, he had already been deposed. However, in his supplemented Rule 213 disclosure, defendant Kazan divulged that Dr. Ducker would also be discussing his diabetic patient who underwent the same surgery and experienced the same complication following surgery as plaintiff. The disclosure was defendant Kazan's response to plaintiffs' *res ipsa loquitur* theory to show that plaintiff's injury is something that can happen in the absence of negligence. Plaintiffs were denied the opportunity to discover the medical records of Dr. Ducker's patient because defendant alleged physician-patient privilege. The court refused to revisit this issue on the eve of Dr. Ducker's trial testimony.

To resolve discovery disputes, courts must strike the proper balance between competing interests. See *In re Marriage of Bonneau*, 294 Ill. App. 3d 720, 724, 691 N.E.2d 123, 128 (1998). The objectives of

discovery include enhancing the truth-seeking process, enabling attorneys to better prepare and evaluate their cases, eliminating surprises, ensuring that judgments rest upon the merits of the case, among others. *Mistler*, 111 Ill. App. 3d at 231-32, 443 N.E.2d at 1128. In this case, the trial court was charged with maintaining a balance among the above objectives, as well as ensuring equity and preserving procedural efficiency. With these considerations in mind, we hold that the trial court properly allowed Dr. Ducker to testify concerning his insulin-dependent patient without producing her medical records.

Our first consideration is that equity vested with defendant Kazan when plaintiffs resurrected the *res ipsa loquitur* theory immediately prior to trial, after discovery was completed. The court stated:

> "THE COURT: Why is this whole issue created, other than by your own pleadings? That we would not be confronted with the problem of observed single case unless we had a *res ipsa* count. We do have a *res ipsa* count. You create your own problem by your insistence in pursuing it which you have the absolute right to do. But then, I get late disclosure on *res ipsa*, and I can't assume one side of the coin and say it's all right for you to late disclose on *res ipsa* and not allow them to late disclose on *res ipsa*. So the anecdotal nature of the evidence [patient and her medical records] only becomes relevant under a theory of *res ipsa*. *** I can't put any credence in an argument that you did not have the right to cross-examine him on it because you created the problem, because you did not disclose until either September 17 or 18 the *res ipsa* opinions."

In *Adami v. Belmonte*, 302 Ill. App. 3d 17, 704 N.E.2d 708 (1998), defendant was aware of plaintiff's expert's opinion, but made no effort to find a rebuttal witness. Defendant determined plaintiff would not call this expert to testify, relying on plaintiff's failure to disclose the expert as an opinion witness under Rule 213 (166 Ill. 2d R. 213). Two weeks before trial, plaintiff revealed she would call the expert in her case in chief. Lateness precluded defendant from finding an expert to refute plaintiff's expert's testimony. Accordingly, this court determined that the trial court did not abuse its discretion when it barred plaintiff's expert from testifying. See *Adami*, 302 Ill. App. 3d at 22, 704 N.E.2d at 712.

In this case, the court utilized its discretion to allow plaintiffs to belatedly resurrect their *res ipsa loquitur* claim and to allow defendant Kazan to update his Rule 213 disclosure to refute the *res ipsa loquitur* claim. In fact, Dr. Ducker's deposition occurred on September 13, 1996, while the *res ipsa loquitur* opinion was revealed to defendant Kazan by plaintiffs' expert on September 18, 1996. On October 28,

1996, the court ordered that testimony on *res ipsa loquitur* would be allowed at trial. Both sides were allowed to supplement based on Rule 213 because of the new *res ipsa loquitur* disclosure. The supplement was due by November 4, 1996, the date the trial began. Fairness demanded that plaintiffs be denied any further indulgence by the trial court.

Next, we must take into consideration that the excluded medical records did not concern plaintiff's treatment, but an unrelated patient's treatment. Therefore, plaintiffs attempted to involve a collateral issue in this case. See *Schuchman v. Stackable*, 198 Ill. App. 3d 209, 230, 555 N.E.2d 1012, 1026 (1990). While the rules make it clear that discovery procedures were designed to be flexible and adaptable to the infinite variety of cases and circumstances appearing in the trial court, discovery rules also have established guidelines for a fair and orderly procedure by which discovery may be accomplished while still protecting against abuses and unfairness. *Mistler*, 111 Ill. App. 3d at 232, 443 N.E.2d at 1128. For instance, the right of discovery is limited to disclosure regarding matters relevant to the subject matter involved in the pending action. *Mistler*, 111 Ill. App. 3d at 232, 443 N.E.2d at 1128. Therefore, discovery should be denied where there is insufficient evidence that the requested discovery is relevant. *Mistler*, 111 Ill. App. 3d at 232-33, 443 N.E.2d at 1128.

In order to cross-examine and possibly impeach defendant Kazan's expert witness, plaintiffs argue they should have been allowed to look at the medical records of the patient in Dr. Ducker's study. However, we find no authority where a court allowed a party to discover background information on subjects who comprise a study relied upon by an expert for his opinion. Such a practice would result in never-ending discovery and subtrials. As the trial court in this case stated:

> "If I were to adopt the view espoused vis-a-vis your argument that no doctor could testify as to his experience in any procedure without producing the patient's records for perhaps 20 years, wherein it is his experience concerning a certain procedure, number one, that is not the law, and number two, that the privilege is not owned by the doctor it's owned by the patient."

To that end, "thorough cross-examination of medical doctors must be tempered with *** avoidance of subtrials on issues remote from the subject of the lawsuit." *Davis v. Hinde*, 141 Ill. App. 3d 664, 665, 490 N.E.2d 1049, 1050 (1986). Thus, the medical records of the patient from Dr. Ducker's study are a collateral matter to the issue of plaintiffs' immediate action, and, therefore, the trial court did not abuse its discretion in barring them.

Furthermore, allowing plaintiffs to discover the patient's medical

records would result in a delay of the trial. The court allowed each side a week to update its expert's deposition testimony after plaintiffs revealed their *res ipsa loquitur* testimony. Considering the court has the inherent authority to control its docket (*In re Asbestos Cases*, 224 Ill. App. 3d 292, 297, 586 N.E.2d 521, 524 (1991)), denying plaintiffs more time to delve into the medical records of a subject of Dr. Ducker's study was not an abuse of discretion.

While the trial court denied plaintiffs the right to further discovery involving Dr. Ducker's patient, the court allowed plaintiffs the broadest possible latitude in cross-examining Dr. Ducker. The court also limited Dr. Ducker's testimony to the facts in the article which were all available to plaintiffs. Thus, we conclude plaintiffs' due process right to cross-examination was not abridged.

Moreover, the trial court directed that Dr. Ducker's article and the contents therein were to be used only as a basis of Dr. Ducker's opinion—not as substantive evidence. In *Wilson v. Clark*, 84 Ill. 2d 186, 417 N.E.2d 1322 (1981), our supreme court specifically adopted Federal Rules of Evidence 703 and 705, allowing experts to give opinion testimony based upon information that has not been admitted into evidence, as long as the facts relied upon are sufficiently reliable. *Wilson*, 84 Ill. 2d at 193-96, 417 N.E.2d at 1326-27. If the trial court determined that the underlying data were of the sort that is typically relied upon by experts in forming opinions, the expert may reveal the data, not as substantive evidence, but for the limited purpose of explaining his opinion. *City of Chicago v. Anthony*, 136 Ill. 2d 169, 185-86, 544 N.E.2d 1381, 1389 (1990).

The key element is whether the information relied upon by the expert is reliable, and reliability stems from the fact that the data are of the sort customarily relied upon in forming opinions of the type being rendered. *Dugan v. Weber*, 175 Ill. App. 3d 1088, 1097, 530 N.E.2d 1007, 1013 (1988). Further, "the reports envisioned by the court as providing reliability were reports made and utilized during the course of medical practice, not reports formed for litigation purposes." *Dugan*, 175 Ill. App. 3d at 1098, 530 N.E.2d at 1013. Indeed, Dr. Ducker's analysis of 172 of his patients who underwent posterior laminectomies was sufficiently reliable to have allowed Dr. Ducker to refer to it when testifying for the limited purpose of explaining the basis for his opinion.

Also, we consider that the court limited the use of Dr. Ducker's article and the contents therein. Details concerning the patient were allowed only for the limited purpose of refuting the *res ipsa loquitur* theory by arguing this kind of injury does happen in the absence of negligence. It was not allowed under plaintiffs' other claim based in negligence.

Thus, in balancing all of these considerations, we conclude the trial court did not err in refusing to give plaintiffs the opportunity to obtain the medical records of Dr. Ducker's patient. To that end, the trial court properly exercised its discretion in a competent and fair matter. Due to our finding, we elect not to discuss the applicability of the physician-patient privilege.

Next, plaintiffs argue that, at trial, Dr. Ducker testified to facts and opinions about his patient that could not be found in Dr. Ducker's article or in defendant Kazan's Rule 213 disclosures on *res ipsa loquitur*. Also, plaintiffs argue that defendant Kazan included these new facts and opinions in his closing argument.

■ Plaintiffs claim that, at trial, Dr. Ducker testified to six facts not contained within Dr. Ducker's article in violation of the court's order. However, according to the record, plaintiffs failed to object to each of these allegedly new facts. Because counsel did not object, any error in allowing the testimony is waived. *Hubbard v. Sherman Hospital*, 292 Ill. App. 3d 148, 156, 685 N.E.2d 648, 654 (1997). Additionally, plaintiffs' counsel failed to object to these statements during closing argument. Again, plaintiffs failed to preserve the alleged errors for review. *Hubbard*, 292 Ill. App. 3d at 156, 685 N.E.2d at 654.

■ Next, plaintiffs argue no testimony about Dr. Ducker's patient should have been admitted because its probative value was outweighed by its prejudicial effect. However, we find that evidence concerning Dr. Ducker's patient had sufficient probative value for the purpose of determining if such an event could occur in the absence of negligence to outweigh any prejudice that might have resulted from its admission. See *Cooper v. Chicago Transit Authority*, 153 Ill. App. 3d 511, 522 (1987). Moreover, it would have been prejudicial to defendant Kazan if the court had not allowed Dr. Ducker to discuss his patient after deciding to allow plaintiffs to resurrect their *res ipsa loquitur* claim.

■ Next, plaintiff argues that Dr. Ducker's article should have been barred from reference at trial because it was not "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." See Fed. R. Evid. 703. Defendant Kazan argues that Dr. Ducker's personal experience was an appropriate basis for his expert opinion.

In *Flynn v. Edmonds*, 236 Ill. App. 3d 770, 602 N.E.2d 880 (1992), the testifying expert reconfirmed his own opinion of the standard of care prior to his deposition by evaluating the records of the last 11 patients treated for a dislocated elbow at the medical facility. He found that 7 of 11 of these patients were sent home to recover just like plaintiff. In allowing this testimony, the trial judge instructed the jury that evidence of the 11 patients was not being offered for its truth, but only to show the basis of the expert's opinion.

In *Flynn*, plaintiffs argued that since the medical records of these 11 patients were not produced, they represented hearsay and testimony in reference to them should have been barred. However, the court stated:

"For a physician to confirm his understanding of customary care through records of similar cases handled at his clinic appears to be little more than a standard research technique. As such, we find that it satisfies the dictates of Federal Rules of Evidence 703 and *Wilson v. Clark*, 84 Ill. 2d 186 ***(1981), requiring data reasonably relied upon by experts in the particular field, and is consistent with the dictates of our supreme court's opinion in *Wilson*." *Flynn*, 236 Ill. App. 3d at 791-92, 602 N.E.2d at 893.

Similarly, Dr. Ducker reviewed the records of patients who suffered from cervical radiculopathy for the purpose of presenting "in detail our surgical technique in conjunction with an analysis of our long-term results in clinical situations." While reviewing the records of his patients, Dr. Ducker determined that only one patient had experienced complications and deduced that "vascular insufficiency in conjunction with the diabetes may offer the best explanation." This study of old cases was also a standard research technique and the trial court did not err in finding it was reliable.

Furthermore, Dr. Ducker's testimony was reasonably reliable since it was based on his own experience and reasoning. An expert may rely on his own experience and "first-hand observation." *Wilson*, 84 Ill. 2d at 193, 417 N.E.2d at 1326. No rule prevents witnesses from making estimates based on their observations. *Glassman v. St. Joseph Hospital*, 259 Ill. App. 3d 730, 753, 631 N.E.2d 1186, 1203 (1994).

Finally, plaintiffs claim a new trial is compelled because defense counsel made numerous representations about diabetes during opening statement on which no evidence was ever introduced. Defendant Kazan argues first that plaintiffs have waived this argument because they failed to object to the introduction of this evidence during the opening statement.

Generally, an assignment of error will not be considered on appeal unless an objection to the alleged prejudicial argument was made in the trial court. *Schwedler v. Galvan*, 46 Ill. App. 3d 630, 642, 360 N.E.2d 1234, 1332 (1977). Nevertheless, "if prejudicial arguments are made without the objection of counsel or interference of the trial court to the extent that the parties litigant cannot receive a fair trial and the judicial process stand without deterioration, then, upon review this court may consider such assignments of error even though no objection was made at the trial level." *Schwedler*, 46 Ill. App. 3d at 642, 360 N.E.2d at 1332-33.

■ The general rule as to statements made by counsel in his opening statement to the jury is that such statements are not improper if made in good faith and with reasonable ground to believe that the evidence is admissible, even though the intended proof referred to is afterwards excluded. *Schwedler*, 46 Ill. App. 3d at 640, 360 N.E.2d at 1331. However, in the absence of good faith, or where prejudice is clearly produced, whether as the result of accident, inadvertence, or misconception, the rule is to the contrary. *Schwedler*, 46 Ill. App. 3d at 640, 360 N.E.2d at 1331. Moreover, no statement should be made in counsel's opening statement to the jury that counsel does not intend to prove or cannot prove. *Gillson v. Gulf, Mobile & Ohio R.R. Co.*, 42 Ill. 2d 193, 197, 246 N.E.2d 269, 272 (1969). Counsel may summarily outline what he expects the evidence admissible at the trial will show. *Gillson*, 42 Ill. 2d at 197, 246 N.E.2d at 272.

The trial court retains the sound discretion to determine whether the remarks or conduct of counsel interfered with the right to a fair trial. *Walters v. Lincoln Electric Co.*, 197 Ill. App. 3d 920, 925, 557 N.E.2d 208, 211 (1990). "The trial court [is] in a better position to observe the impact of alleged misconduct." *Walters*, 197 Ill. App. 3d at 925, 557 N.E.2d at 211. Therefore, absent a clear abuse of discretion, the reviewing court will not overturn the trial court's determination as to the prejudicial effect of that remark or conduct. *Walters*, 197 Ill. App. 3d at 925, 557 N.E.2d at 211.

■ In response to the late disclosure of the *res ipsa loquitur* theory by plaintiffs, defendant Kazan was allowed to elicit testimony by Dr. Ducker about his experience with central cord syndrome following a posterior laminectomy. He described the event in his article as follows:

> "Only one patient suffered any sequelae from this procedure—a residual central cord syndrome. Clinically, this case did not differ in any way from the other 171 cases, but the patient was an insulin-dependent diabetic. On her MRI scan, the disc herniation was broad based. At the time of her operation, the disc could not be removed and a decompressive foraminotomy was performed. No cord trauma was observed, nor were there episodes of hypotension or hypoxia. Nothing untoward occurred intraoperatively or postoperatively, yet despite the lack of any precipitating factor, the patient appears to have suffered a partial central cord syndrome. The exact cause of this event is unknown, but vascular insufficiency in conjunction with the diabetes may offer the best explanation."

Dr. Ducker was espousing the opinion that central cord syndrome did happen in the absence of negligence and that diabetes was a contributing factor. Therefore, comments on diabetes in defendant Kazan's opening statement were appropriate as diabetes was a relevant issue

in the case. Specifically, the jury needed to understand the physiologic processes involved in diabetes to understand how diabetes related to the case.

Moreover, the comments made in the opening statement that addressed the risk of stroke associated with diabetes were based upon the deposition testimony of the defense experts, Dr. D'Angelo and Dr. Ducker. Also, the link between diabetes, poor blood flow and stroke was touched upon by both defense experts during trial. Thus, defense counsel was justified in making clear to the jury the effect of diabetes on the body. Defense counsel's statements were made in good faith, were based upon deposition testimony and testimony at trial, and they were not unfairly prejudicial.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'BRIEN, P.J., and O'MARA FROSSARD, J., concur.