# Illinois Official Reports

## Appellate Court

*Watson v. West Suburban Medical Center*, 2018 IL App (1st) 162707

| | |
|---|---|
| Appellate Court Caption | MARQUES WATSON JR., a Minor, by Denise Leonard, His Mother and Guardian of His Estate; and DENISE LEONARD, Individually, Plaintiffs-Appellants, v. WEST SUBURBAN MEDICAL CENTER; RESURRECTION HEALTH CARE CORPORATION; and VHS WEST SUBURBAN MEDICAL CENTER, INC., Defendants (West Suburban Medical Center and Resurrection Health Care Corporation, Defendants-Appellees). |
| District & No. | First District, Fifth Division<br>Docket No. 1-16-2707 |
| Filed | March 30, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-3340; the Hon. Lorna E. Propes, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Joan M. Mannix, Christopher Patrick Ford, and Byron L. Mason, all of Chicago, for appellants.<br><br>Aiju C. Thevatheril, Catherine Basque Weiler, and Elizabeth A. Bruer, of Swanson, Martin & Bell, LLP, of Chicago, for appellees. |

JUSTICE HALL delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment and opinion.


**OPINION**

¶ 1    The plaintiffs, Marques Watson Jr. and Denise Leonard, his mother, filed a medical malpractice complaint against the defendants, West Suburban Medical Center, Resurrection Health Care Corporation (collectively WSMC), and VHS West Suburban Medical Center, Inc. (VHS). The plaintiffs' motion to dismiss VHS voluntarily and without prejudice was granted prior to trial. The jury found for WSMC and against the plaintiffs, and the trial court entered judgment on the verdict. Following the denial of their posttrial motion, the plaintiffs filed a timely notice of appeal.

¶ 2    On appeal, the plaintiffs contend that the jury's verdict must be reversed and a new trial ordered because (1) numerous trial court errors denied them a fair trial and (2) the jury's verdict was against the manifest weight of the evidence. After careful review of the evidence at trial, we conclude that the plaintiffs received a fair trial and the jury's verdict was not against the manifest weight of the evidence.

¶ 3                              BACKGROUND
¶ 4                              I. Facts

¶ 5    On December 11, 2008, 24-year-old Denise was 29 weeks into her pregnancy. On that date, she had a regularly scheduled appointment at the PCC Community Wellness Clinic. There she was seen by Dr. Thomas Staff who detected an abnormally high fetal heart rate. Dr. Staff directed Denise to go to the WSMC's obstetrical triage to determine if she was in preterm labor and to monitor the fetal heart rate. In accordance with Dr. Staff's direction, that evening Denise went to WSMC where she was seen by nurse Felicia Hughes-Schmidt (nurse Hughes) and Dr. Sherif Milik, the maternal/child health fellow (the fellow).[1]

¶ 6    Dr. Milik performed a sterile speculum exam to determine if Denise's amniotic membrane (membrane) had ruptured. The sterile speculum exam involved three tests to determine if the membrane had ruptured: (1) checking for the pooling of fluid in the posterior fornix of the vagina; (2) "ferning," where a swab taken from the pooled fluid is tested; and (3) testing the pooled fluid with a nitrazine strip. The results of the three tests showed that the membrane had not ruptured. Dr. Milik then performed a digital exam to determine if Denise's cervix was dilated or shortened. After several hours of observation and a determination that Denise was not in premature labor, Dr. Milik discharged her at or around 11 p.m. on December 11, 2008.

¶ 7    At approximately 3 a.m. on December 12, 2008, Denise felt a gush of water down her leg and was taken by ambulance to WSMC. At this time, Dr. Christine Swartz was the fellow on the labor and delivery floor, and Dr. Natasha Diaz was the attending doctor (the attending). Denise was seen by nurse Hughes and Dr. Stephen Johnson, a second-year resident. According

---

[1]A "fellow" refers to a physician who has completed a residency and has received the opportunity to obtain additional training through the award of a fellowship.

to Denise, Dr. Johnson entered her room and lifted the sheet covering her, commenting that he did not see anything. He then left the room. At 5:45 a.m. on December 12, 2008, Dr. Johnson signed an order discharging Denise from WSMC.

¶ 8 Upon arriving home, Denise slept until 7 p.m. When she woke up, she noticed her stomach had dropped. Rather than return to WSMC, she had a cousin drive her to University of Illinois Hospital (UIC) where she was admitted. A resident performed a sterile speculum exam, which revealed that Denise's membrane had ruptured. Because the rupture increased the risk of an infection, Denise was given antibiotics. As a matter of course, she was screened for Group B streptococcus (GBS).[2] Denise began displaying symptoms of infection and was diagnosed with clinical chorioamnionitis (chorio) due to a GBS infection and sepsis. Marques was delivered by an emergency C-section.

¶ 9 While at birth Marques's blood culture tested negative for GBS, he was given antibiotics for his first five days of life. He was taken off the antibiotics on December 17, 2008, but remained in the neonatal intensive care unit (NICU) of UIC. On December 26, 2008, Denise's C-section incision opened. Testing of the incision area was positive for GBS.

¶ 10 Between December 18, 2008, and January 3, 2009, Marques experienced incidents of slow heart rate, apnea, and low temperatures. On January 2, 2009, he had to be resuscitated, and he was restarted on antibiotics. On January 4, 2009, Marques tested positive for GBS and was diagnosed with meningitis, which resulted in significant brain damage.

¶ 11 II. Pretrial Proceedings

¶ 12 A. *The Complaint*

¶ 13 On March 28, 2012, the plaintiffs filed their medical malpractice complaint against WSMC. The first amended complaint was filed on October 12, 2012. Count I alleged that WSMC was negligent in that it failed to timely assess, diagnose, and treat fetal distress and/or infection in the face of the signs and symptoms; failed to perform the appropriate tests to rule out infections; failed to properly staff its labor and delivery floor; failed to timely call for an appropriate consultation; failed to properly monitor Denise; discharged Denise prematurely; failed to follow the "chain of command" to preclude Denise's premature discharge; and failed to follow up with Denise. The plaintiffs alleged further that WSMC's negligence resulted in personal and financial injuries to Marques. Count II was brought pursuant to the Rights of Married Persons Act (750 ILCS 65/15 (West 2012)) (commonly known as the Family Expense Act).[3] Thereafter, the parties engaged in extensive discovery.

¶ 14 B. *Pretrial Rulings*

¶ 15 1. Barring Rebuttal Witness Testimony

¶ 16 On January 13, 2016, Circuit Court Judge Janet Adams Brosnahan ordered that the plaintiffs disclose their rebuttal experts by January 20, 2016. On January 20, 2016, the plaintiffs disclosed Dr. Barry Schifrin as their rebuttal expert.

---

[2]Some of the witnesses referred to Group B Strep as "GBBS." For consistency, we will use the acronym "GBS."

[3]Counts III and IV of the first amended complaint were alleged against VHS and are not at issue in this appeal.

¶ 17    On January 22, 2016, WSMC filed an emergency motion to bar Dr. Schifrin's testimony. WSMC pointed out that on January 8, 2016, the parties had taken the evidence deposition of Dr. Sarah Kilpatrick, an obstetrician/gynecologist, who had treated Marques. To allow the plaintiffs' to present Dr. Schifrin's testimony would deprive WSMC of the opportunity to effectively and adequately cross-examine Dr. Kilpatrick. In the alternative, WSMC requested that Dr. Kilpatrick's evidence deposition be stricken, and the parties be permitted to redepose Dr. Kilpatrick following the completion of Dr. Schifrin's deposition.

¶ 18    On January 29, 2016, a hearing was held on WSMC's motion to bar Dr. Schifrin's rebuttal testimony. In ruling on the motion, Judge Brosnahan stated as follows:

> "Any order or ruling I make today shouldn't be construed as a sanction. It's a remedy in the interest of promoting the goals of allowing the parties to have a fair trial on the merits.
>
> And it is unfair and unduly prejudicial to allow the plaintiff[s] to get evidence testimony and then disclose an expert on the very same topics that were addressed by the witnesses in evidence.
>
> So, I believe the least severe remedy I can fashion if the plaintiff[s] truly believe[ ] that they need this rebuttal testimony is to strike the evidence testimony and give you a chance to do a do-over. If the plaintiff[s] [do not] want to do that, then the plaintiff[s] ha[ve] to forgo the opportunity to disclose rebuttal opinions now on testimony that's already been received in evidence."

Judge Brosnahan ordered Dr. Kilpatrick's evidence deposition stricken, unless the plaintiffs withdrew Dr. Schifrin's rebuttal disclosure by January 31, 2016. The plaintiffs chose to withdraw Dr. Schifrin's rebuttal disclosure.

¶ 19                    2. Motions *in Limine*

¶ 20                    a. *Denise's Prior Abortion*

¶ 21    The plaintiffs' motion *in limine* No. 30 sought to prevent the defense from making any reference, directly or indirectly, to the fact that Denise had an abortion. The trial court granted the motion, "[b]ut with the caveat that the defense can—may say that she had a prior pregnancy. And all witnesses will be cautioned to not say anything other than she had an earlier pregnancy."

¶ 22                    b. *Cumulative Testimony*

¶ 23    WSMC's motion *in limine* No. 13 sought an order excluding cumulative testimony on standard of care and causation testimony, specifically by Drs. Edith Gurewitsch (maternal fetal medicine), Carolyn Crawford (neonatology), and Armando Correa (pediatric infectious diseases) and nursing expert, Debra Sperling, RN.

¶ 24    As to cumulative causation testimony, the trial court granted the motion as to the three doctors and by agreement as to Ms. Sperling. The court explained its ruling as follows:

> "Now with regard to the [maternal fetal medicine] person and the [infectious disease] person, I can see where they might have slightly different testimony about causation, all the business about [GBS] and the time it takes to incubate or whatever a better word would be, all of that might be something that [infectious disease] person would address in more detail. And that is going to be up to you."

¶ 25    In discussing the standard of care, the plaintiffs' attorney explained that of the experts he disclosed, Dr. Gurewitsch, the maternal fetal medicine expert, would be testifying as to the standard of care applicable to Dr. Johnson with regard to the allegations of negligence against him. The following colloquy occurred:

> "THE COURT: So far as the other witnesses, the only one who can testify about the standard of care is Gurewitsch?
>
> * * *
>
> MR. FORD [(PLAINTIFFS' ATTORNEY)]: I mean, I think the others are qualified to do it. If I've done it through Gurewitsch—what you're saying is I have to make an election of who I am putting in?
>
> THE COURT: Yes.
>
> MR. FORD: I understand that, Your Honor. And if all of those opinions get in through Gurewitsch, then I don't need to do it through anybody else. But I don't know what your Honor's rulings are yet. Although, I don't think that will be a problem.
>
> THE COURT: Granted as to Gurewitsch only with regard to the standard of care."

¶ 26                                             III. Jury Trial

¶ 27    The issues at trial were (1) whether Dr. Johnson and/or nurse Hughes violated the standard of care applicable to their professions and (2) whether Marques suffered early or late onset of GBS. The following is a summary of the nonexpert and expert trial testimony pertinent to those issues.

¶ 28                                       A. *For the Plaintiff*

¶ 29                                       1. Dr. Stephen Johnson

¶ 30    On December 12, 2008, Dr. Johnson was a second-year resident at WSMC. He had no independent recollection of treating Denise. Dr. Johnson's testimony was based on his notes and Denise's medical records from December 12, 2008.

¶ 31    Dr. Johnson evaluated Denise to determine if she had undergone a spontaneous rupture of the membrane. The records showed that he did not order any lab work or a GBS test, and his notes did not state that he sought a consultation with an obstetrics-gynecologist physician.

¶ 32    Dr. Johnson agreed that had he performed a sterile speculum exam on a 20- to 30-week pregnant patient and found the membrane had ruptured, the standard of care required that the patient be admitted to the hospital and placed on antibiotics. The standard of care also required that Dr. Johnson consult the fellow or the attending. Dr. Johnson further agreed that it would be a deviation from the standard of care to perform a digital exam before or in lieu of a sterile speculum exam. In his notes, the doctor wrote, "not ruptured," which meant that he evaluated Denise for a rupture of the membrane though he did not document the details of the testing. Dr. Johnson did document that he had performed a digital exam on Denise.

¶ 33    As a second-year resident, Dr. Johnson understood that he was not to discharge a patient before a consultation with the attending. To do so would have been a violation of the standard of care. On Denise's WSMC discharge order, the space for the fellow's or attending's signature was blank. Dr. Johnson maintained that he would never discharge a patient unless he had consulted with the fellow or the attending.

¶ 34    Dr. Johnson acknowledged that his notes did not indicate that the sterile speculum exam was performed. However, nurse Hughes made a notation that the nitrazine strip test was negative. Dr. Johnson's custom and practice were always to speak to the fellow or the attending before discharging a patient.

## 2. Natasha Diaz, MD

¶ 36    On December 12, 2008, Dr. Diaz was the attending for the labor and delivery floor at WSMC. She did not recall Denise, and her review of the WSMC records did not refresh her recollection. Denise's WSMC records did not show any notes by Dr. Diaz. It was Dr. Diaz's custom and practice to write a note in the chart if she had seen a patient. If she saw the patient and discussed the case with the fellow, she would sign the discharge order.

¶ 37    Dr. Diaz could not speculate on whether Dr. Johnson received an approval to discharge Denise. She acknowledged that at her deposition testimony, she testified that it would have been a violation of the standard of care if Dr. Johnson had discharged Denise without either Dr. Swartz's or her approval. Dr. Diaz explained that if she did not sign the discharge form, it could mean that she did not have any contact with the patient. She was not required to see a patient.

## 3. Christine Swartz, MD

¶ 39    On December 12, 2008, Dr. Swartz was a fellow at WSMC. She had no recollection of Denise, and a review of the records did not refresh her recollection. Dr. Swartz did not find any notes she had written in Denise's WSMC records. The WSMC records reflected that at 4:06 a.m. on December 12, 2008, Dr. Swartz was notified about Denise; the notification could have been via a pager.

¶ 40    According to the WSMC system in place in December 2008, if a resident saw a patient, it was the resident's responsibility to present the case to the attending or the fellow. If Dr. Swartz saw the patient, it was her custom and practice to write a note and countersign the resident's signature. It would be a deviation from the standard of care for a resident to discharge a patient without the consent of the attending. Dr. Swartz agreed that the lack of the attending's signature does not mean the attending did not see the patient. It would be unusual for a resident to discharge a patient without ever speaking to the attending. Dr. Swartz was familiar with situations in which medical records were not signed by the fellow or an attending. Such a situation could occur as a result of a shift change or from human error. The care providers were responsible to review the records prior to a shift change.

## 4. Felicia Hughes-Schmidt, RN

¶ 42    At the time of the events in this case, nurse Hughes had been a labor and delivery nurse for three years. Like Dr. Johnson, she had no independent recollection of Denise and her testimony was based on the WSMC records and her notes.

¶ 43    WSMC had a written policy referred to as the "chain of command." Under the chain of command, if a nurse feels that the doctor is not performing his duties properly, the nurse consults her immediate superior. If the nurse's concerns are not addressed at that level, the nurse continues up the authority level, even to the medical director of the department. Following the chain of command is considered a nursing responsibility.

¶ 44    On December 12, 2008, Denise returned to WSMC around 3 a.m., complaining of vaginal leaking. Nurse Hughes noted that when Denise coughed, a small amount of cloudy fluid ran down her legs; the fluid tested "[n]itrazine negative." Because of the risk of false negative result, the doctor would always do a confirming test during the speculum exam. Nurse Hughes acknowledged that she did not document any examination by Dr. Johnson.

¶ 45    Nurse Hughes was not permitted to order a GBS test unless she was ordered to do so by a doctor. In that case, she would send the GBS test swab to the laboratory. The results would not have been available for a couple of days and would not have been available prior to Denise's discharge on December 12, 2008.

¶ 46    On Denise's discharge record, nurse Hughes wrote that Denise was discharged by Dr. Johnson. She did not document the presence of either Dr. Swartz or Dr. Diaz. If either of them had ordered Denise's discharge, she would have documented that information. She acknowledged that it would have been a breach of the standard of care for Dr. Johnson to discharge Denise on his own authority.

¶ 47    Nurse Hughes explained that the doctors at WSMC routinely communicated with each other. When Dr. Johnson wrote that he discharged Denise, he actually got the order from the attending. She did not write "per the attending" because she did not receive the order directly from the attending. Had nurse Hughes thought that Dr. Johnson was wrong to discharge Denise, she would have brought the matter to the attention of the charge nurse. The matter would then be discussed with the attending, Dr. Johnson, and the nurses. Since Denise's membrane had not ruptured and she was not in premature labor, it was proper to send her home.

¶ 48    Nurse Hughes tested the fluid that appeared when Denise coughed with the nitrazine stick. She noted that the nitrazine test was negative, meaning that the fluid was not amniotic fluid. The fact that Denise complained of pain in her back lower abdomen was not unusual for a patient in the third trimester of pregnancy. Nurse Hughes noted that at 4:06 a.m. she spoke with Dr. Swartz. At that time, she would have informed the doctor of Denise's condition. Dr. Swartz was not required to see the patient in person.

¶ 49    The documentation showed that at 4:10 a.m., nurse Hughes changed the entry for the GBS test from blank to negative. She explained that she had intended to change it to "unknown" rather than "negative" because GBS testing would not have been performed at 29 weeks.

¶ 50    Nurse Hughes was required to be present if Dr. Johnson was performing a digital exam. Had she witnessed Dr. Johnson performing a digital exam on a patient who was complaining that her membrane had ruptured, she would have stopped him because performing a digital exam introduced the risk of an infection.

¶ 51    The WSMC records reflected that Dr. Johnson saw Denise at 5 a.m. on December 12, 2008, and discharged her at 5:45 a.m. that morning. According to nurse Hughes, that was sufficient time for Dr. Johnson to perform the speculum and digital exams, report the findings to the attending and the fellow, discuss it with them, and for them to make a decision on the necessity of further care for the patient. Nurse Hughes would never allow a doctor or a nurse to conclude there was nothing wrong with a patient by merely lifting the sheet off the patient and looking at the patient. The fact that she did not document that Dr. Swartz saw Denise did not mean that Dr. Swartz was uninvolved in Denise's care.

## 5. Andre Kajdacsy-Balla, MD

¶ 53     Dr. Balla, the UIC pathologist, discussed the pathology report from the examination of the placenta following Marques's delivery. He explained that the testing of the placenta revealed the premature rupture of the membrane and "clinical" chorio. The existence of chorio must be confirmed by the pathologist and would then be referred to as "histological" chorio. The report referred to the " 'pale greenish discoloration of the fetal surface of the placenta.' " Such a sign is frequently associated with chorio but was not diagnostic. Another sign is the presence of neutrophils, which respond to fight an infection, inflammation, and irritation. The ultimate diagnosis was acute chorio. While related, the existence of chorio does not prove that GBS exists.

¶ 54     Dr. Balla agreed that even though the placenta was removed via the C-section, it could become contaminated as it was pulled through the various layers of skin and other parts of the incision. In this case, no culture of the placenta was done, and therefore, there is no proof that the placenta had GBS on it. No culture of the amniotic fluid was done. Dr. Balla acknowledged that the fetal membranes in this case were thin and transparent, whereas in severe cases of chorio, the fetal membranes are not transparent.

¶ 55     According to Dr. Balla, mycoplasm can cause chorio, but in the majority of cases, chorio is caused by GBS. About 20% of children born with placentas with chorio suffer ill effects.

## 6. Kelly Riggs, MD

¶ 57     In December 2008, Dr. Riggs was in her last year of residency at UIC. She had no recollection of Marques. Her review of a January 14, 2009, note she prepared did not refresh her recollection.

¶ 58     Dr. Riggs wrote the note for the infectious disease service. In preparing the note, Dr. Riggs would have reviewed the patient's chart, seen the patient, and discussed the case with the attending. After seeing the patient with the attending, she would write the note based on the patient's past medical history and the attending's recommendations. The attending in this case was Dr. Frank.

¶ 59     According to Dr. Riggs's note, Marques was born at 31-weeks gestation with late onset of GBS. He was given antibiotics for five days following delivery. On January 3, 2009, Marques was again given antibiotics to rule out necrotizing enterocolitis, an infection of the intestinal system. Blood and cerebral cultures were positive for GBS. The other antibiotics were discontinued, and Marques was started on penicillin. On January 4, 2009, Marques had a seizure and was given "phenobarb," an antiepileptic medication. A lumbar puncture was done and grew GBS. A second lumbar puncture was done on January 6, 2009, revealing that the GBS was continuing to grow despite adequate treatment. Ultrasound and CT-scan tests performed on January 13, 2009, revealed multiple brain abscesses on both hemispheres of Marques's brain.

¶ 60     Reviewing Marques's birth history, Dr. Riggs found premature prolonged rupturing of the membrane at 3 a.m. on December 12, 2008. She noted that Denise was given antibiotics and the delivery was via C-section. There was a concern about chorio, an infection of the placenta, and that Denise's heart rate was fast. Denise's GBS status was listed as unknown. Marques was transferred to the neonatal intensive care unit due to prematurity and respiratory distress.

¶ 61 Dr. Riggs discussed with Dr. Frank how Marques could have gotten a GBS infection when he had been treated with the standard post-delivery protocols, *i.e.*, antibiotics until the blood cultures were negative for five days. Dr. Frank believed that Marques suffered an overwhelming infection. The infection was treated with the antibiotics, but a few bacteria were not completely killed off and could have "seeded" his brain.

¶ 62 Dr. Riggs acknowledged that in her note she referred to Marques's condition multiple times as "late onset GBS," meaning that GBS manifested itself after the first seven days of life. She was aware that the blood culture taken from Marques when he was born was negative for GBS.

¶ 63 Dr. Riggs was not aware that Denise's C-section incision tested positive for GBS. Although the NICU was a closed unit, mothers and fathers could visit, and mothers could breastfeed their babies.

¶ 64 7. Richard Boyer, MD

¶ 65 Dr. Boyer was board-certified in radiology, diagnostic radiology, pediatric neurology, and pediatric radiology. He testified as an expert as to the radiology studies performed on Marques.

¶ 66 On December 23, 2008, Marques underwent an ultrasound to rule out an intraventricular bleed. Premature babies such as Marques were prone to hemorrhages in certain parts of their brains, which were premature at that age. The immaturity of Marques's brain was consistent with his prematurity. While the findings were nonspecific, the ventricles were smaller than they should have been and the evidence of echogenicity, *i.e.*, an increase of water in parts of the brain, indicated further investigation was necessary.

¶ 67 The January 13, 2009, ultrasound showed areas of Marques's brain that were filled with fluid that was destroying or liquefying those areas. Both hemispheres of his brain showed significant progression of disease. Since Marques was diagnosed with meningitis on January 3, 2009, Dr. Boyer opined that complications of meningitis were already present on the December 23, 2008, ultrasound and were full-blown by the time of the January 13, 2009, ultrasound.

¶ 68 Dr. Boyer reviewed the report of Dr. Winnie Mar, the UIC radiologist who read Marques's December 23, 2008, ultrasound. He disagreed with Dr. Mar's reading of the ultrasound, as she failed to note any abnormality. He also disagreed with her finding that the ventricles were normal in shape and size. Dr. Boyer agreed with Dr. Mar that there was no hydrocephalus or hemorrhaging. But because those were the areas Dr. Mar concentrated on, her report was incomplete. Dr. Boyer acknowledged that he had not read Dr. Mar's deposition wherein she testified that she did not find any increased echogenicity.

¶ 69 Dr. Boyer acknowledged that if the culture taken from Denise's C-section wound on December 26, 2008, was positive for GBS, the findings from the January 13, 2009, ultrasound would be consistent with Marques having acquired GBS between December 26, 2008, and January 13, 2009. He still maintained that the December 23, 2008, ultrasound showed abnormalities and that Marques suffered from early onset of GBS, which was modified by the antibiotics he received following birth.

¶ 70 Dr. Boyer disagreed with Dr. Mar that Marques's ventricles were normal. He explained that in the ultrasound performed on December 23, 2008, Marques's ventricles were not as open

as they should have been by his tenth day of life.

¶ 71                                    8. Theonia Kamman Boyd, MD

¶ 72        Dr. Boyd testified as an expert on pediatric pathology. She explained that if the membrane ruptures, the previously sterile amniotic fluid may become contaminated with bacteria that are present in other parts of the mother's body. The presence of the bacteria triggers the release of the mother's and the baby's infection-fighting cells. By itself, an infection can weaken the membrane and increase the risk of a rupture. The longer the baby stays in the contaminated amniotic fluid increases the risk that all three umbilical vessels will be infected.

¶ 73        Based on the histological features, the gestational age at delivery, and the GBS positive vaginal swab taken from Denise shortly after delivery, Dr. Boyd opined that it was more likely than not Marques was infected with GBS at the time of birth.[4] She further opined that GBS caused the chorio. Based on her pathological findings, Dr. Boyd opined that Marques suffered the early onset of GBS.

¶ 74        Dr. Boyd explained that a baby's pattern of inflammation takes more than a day to develop. Therefore, the infection must have been present a day and a half to two days prior to delivery. Dr. Boyd's findings were consistent with the rupture of the membrane 31 hours and 22 minutes prior to Marques's delivery on December 13, 2008. In terms of pathology, it would not be plausible for the rupture of the membrane to have occurred just prior to going to UIC on December 13, 2008, where she was given antibiotics and Marques's delivery was by emergency C-section. The pathology could not have evolved under any circumstance in an eight or nine hour time frame. Had the infection been there longer than four days, Marques would have died before delivery.

¶ 75        Dr. Boyd's opinion that Marques suffered from early onset of GBS was based on the pathological materials viewed in the clinical context. She acknowledged that using the 48-hour time frame, Denise was infected prior to her examination by Dr. Milik or her appointment with Dr. Staff on December 11, 2008.

¶ 76        Dr. Boyd agreed that the clinical signs of chorio did not mean that histological chorio, as determined by the pathologist, was present; the reverse was true as well. A pathologist may find histological chorio where there were no clinical signs of the infection in the mother or the baby. Based on the inflammatory response Dr. Boyd observed microscopically, the infection was present from a day and a half to two days prior to Marques's delivery.

¶ 77        It was Dr. Boyd's opinion that, prior to delivery, Marques ingested amniotic fluid and microorganisms, which settled in his lungs and gut. The GBS cultured from Denise's vaginal swab was virulent, meaning it had the inherent ability to cause disease. However, it was plausible that the infection was not detected until January 3, 2009.

¶ 78        According to Dr. Boyd, based on the pathology results, the vaginal swab, and the course that followed the neonatal infection, it was more likely than not that early onset of GBS was present no matter when it was recognized clinically.

---

[4]Dr. Boyd later acknowledged that the vaginal swab was taken prior to delivery.

¶ 79

¶ 80    Dr. Gurewitsch, an obstetrician-gynecologist, testified as an expert witness as to the standard of care applicable to Dr. Johnson. She reviewed Denise's records from WSMC and Marques's and Denise's records from UIC.

¶ 81    According to Dr. Gurewitsch, the only way to know if the membrane had ruptured was to perform a sterile speculum exam. On Denise's December 11, 2008, visit to WSMC, Denise reported no leakage of fluid, and the test results from Dr. Milik's sterile speculum exam confirmed that no rupture had occurred. On her return to WSMC on December 12, 2008, Denise reported experiencing a gush of fluid down her leg and thereafter continual leakage of fluid. On this visit, there was no evidence that a sterile speculum exam and the three tests were performed, but there was evidence that Dr. Johnson performed a digital exam on Denise.

¶ 82    Upon her return home, Denise continued to leak fluid, which turned from clear to cloudy and then to pus. Upon Denise's admission to UIC 30 hours later, a rupture of the membrane was confirmed, and antibiotics were administered.

¶ 83    Within a reasonable degree of medical certainty, Dr. Gurewitsch opined that Denise's membrane ruptured at 3 a.m. on December 12, 2008, when she experienced the leakage of the fluid. At that time, antibiotics should have been administered to Denise. Dr. Gurewitsch opined that it was a violation of the standard of care for Dr. Johnson to perform a digital examination without first performing the sterile speculum exam to determine whether the membrane had ruptured. Dr. Johnson also violated the standard of care when his examination of Denise consisted only of lifting the sheet covering her.

¶ 84    Based on her review of the depositions of Drs. Diaz and Swartz, Dr. Gurewitsch further opined that Dr. Johnson discharged Denise without consulting either Dr. Diaz or Dr. Swartz. Dr. Gurewitsch concluded that Denise was discharged from WSMC without being properly evaluated for a rupture of the membrane.

¶ 85    Dr. Gurewitsch agreed that if the membrane had not ruptured, a swab for GBS was not required. She further agreed that if the resident had seen the patient, discussed the patient with the attending, and followed the attending's direction, the resident did not have to make sure the attending signed the discharge order.

### 10. Debra Sperling, RN

¶ 86

¶ 87    Nurse Sperling had been a registered nurse for 35 years and testified as to the standard of care applicable to nurse Hughes.

¶ 88    Ms. Sperling explained that WSMC had chain of command protocols in place on December 12, 2008. In order to rule out spontaneous rupture of the membrane, it was necessary to perform the sterile speculum exam. Where a rupture of the membrane was suspected and the doctor did not perform the exam, or in the absence of the sterile speculum exam, the doctor started a digital examination, the chain of command required the nurse, first, to speak to the doctor about her concerns. If the nurse's concerns were not addressed by the doctor, the nurse was required to report those concerns to the charge nurse and then further up the chain of command if necessary until those concerns were addressed.

¶ 89    Nurse Sperling saw no documentation by Dr. Johnson that he had performed any of the testing from a sterile speculum exam. His notation "not ruptured" was not documentation of the sterile speculum exam. Denise's description of the "examination" Dr. Johnson performed,

*i.e.*, merely lifting the sheet covering her and telling her he did not see anything, was not an examination. Nurse Hughes was required to ask Dr. Johnson why he did not do the sterile speculum exam and go up the chain of command if necessary.

¶ 90                                    11. Carolyn Crawford, MD

¶ 91        Dr. Crawford specialized in pediatrics with a subspecialty in neonatal perinatal medicine. She testified as an expert witness on the timing of Marques's GBS infection.

¶ 92        Dr. Crawford opined that Marques suffered an early onset of GBS as the result of a vertical transmission, ultimately leading to meningitis. Dr. Crawford's opinion was based on Denise's membrane having ruptured over 31 hours prior to Marques's delivery, making it possible for an infection to develop. The infection could have been transmitted to Marques through the amniotic fluid prior to birth, either through his airways or if he swallowed the fluid. The fact that the fluid had turned to pus at the time of delivery meant that Marques had been covered in and breathing and swallowing the purulent fluid. After Marques's delivery, the placenta showed signs of severe infection, both on Denise's side and more so on Marques' side.

¶ 93        Dr. Crawford explained that a C-reactive protein (C-RP) test assists in arriving at the diagnosis of an infection and following its course. Marques's C-RP readings were high, indicating an infection. Marques was given antibiotics for five days, the proper protocol. The antibiotics were stopped on December 17, 2008. Marques then began showing increased signs of apnea, the stoppage of his breathing, and bradycardis, a slowing of the heart rate, both of which could result from an infection. Marques began receiving breast milk through a tube, not by breast feeding. The fact that Marques continued to have bradycardis was a factor in the determination of the diagnosis. On December 21, 2008, the record showed that Marques experienced an episode of apnea, bradycardia, and desaturation (turning blue). The episode could have been the result of infection. Dr. Crawford believed that the episode indicated the return of the infection to Marques. On January 3, 2009, Marques suffered an arrest of his breathing, which Dr. Crawford attributed to sepsis meningitis recurring in Marques. By January 4, 2009, Marques was back on antibiotics but was having episodes of posturing and stiffness from side to side and suffering seizures. The lumbar puncture revealed the presence of GBS, the same infection that Denise tested positive for at UIC.

¶ 94        Dr. Crawford opined that if when she arrived at WSMC on December 12, 2008, Denise had been given the appropriate antibiotics more likely than not, her infection would have been eradicated. In that case, Marques would not have been infected with the resulting complications from meningitis. Dr. Crawford concluded that GBS existed in Denise's vaginal area on December 12, 2008. The CT-scan and MRI studies of Marques's brain showed abscesses and large cysts that could only have developed from a smoldering infection which had existed for three to three and a half weeks.

¶ 95        Dr. Crawford maintained that the note on Denise's chart that she was breastfeeding on December 15, 2008, was a "typo" that was copied on her subsequent charts, and there was no notation on Marques's chart that he was breastfed. She did not believe that Marques's apnea and bradycardis was caused by his premature birth. Dr. Crawford disagreed with Dr. Frank's deposition testimony in which he stated that his January 15, 2009, note on Marques's chart was not to be interpreted as stating that Marques had early onset of GBS. She believed that Marques's infection was suppressed by the antibiotics he was given at birth. While he appeared to get better, the infection had not been completely eradicated from his system and

subsequently returned.

¶ 96                                    12. Denise Leonard

¶ 97    Denise wore a sterile gown and scrubbed her hands with a brush and antibiotic soap before she came in contact with Marques following his birth. According to Denise, she never intended to breastfeed Marques. Between December 14 and December 25, 2008, she held Marques three times for just moments. Denise also visited Marques on December 26, 2008. Later that day, she was not feeling well. Denise returned to UIC where her C-section incision tested positive for GBS, and she was placed on antibiotics for seven days. Denise told the doctors at UIC she was providing breast milk to Marques in bottles. Any reference in UIC records to her breastfeeding Marques was incorrect. On January 7, 2009, her breast milk was tested and was negative for GBS.

¶ 98    Denise acknowledged that she did not mention to anyone that Dr. Johnson's examination consisted only of lifting the sheet covering her.

¶ 99                                    B. *For the Defense*

¶ 100                                   1. Rama Bhat, MD

¶ 101    Dr. Bhat, board-certified in pediatrics and neonatal medicine, was involved in Marques's care at UIC from December 15 to December 31, 2008. While he had no specific recollection, in preparation for caring for Marques, he would have reviewed Marques's prior records. According to the delivery records, Marques's signs were normal at birth, but because of the concerns of chorio in Denise and his premature birth, he was placed on antibiotics, ampicillin and gentamicin. A blood draw was taken prior to the administration of the antibiotics to check if an infection existed. Marques was placed in the NICU because of breathing difficulty, probably due to his premature birth and delivery by C-section, which can cause excessive fluid in the lungs.

¶ 102    On December 20, 2008, the blood culture showed no sign of bacteria or infection. The first C-RP test was done on December 13, 2008, shortly after birth and was slightly elevated, indicating an inflammation. The trend of the subsequent C-RP tests was downward at a rapid pace, indicating no infection. Had an infection existed, the numbers would have continued to rise. Marques's white blood cell count was normal. By December 14, 2008, Marques was breathing on his own. Initially, Marques was fed fluids and then protein intravenously. Babies were not breastfed until they are 35 weeks old or more.

¶ 103    On December 15, 2008, Dr. Bhat observed improvement in Marques since the time of delivery; he noted no symptoms or signs of infection. On December 16, 2008, Marques was started on breast milk via a nasogastric tube. On December 17, 2008, the antibiotics were stopped. The laboratory work ups were normal, and Marques's blood culture negative. Since continuing the antibiotics longer than necessary increased the risk for necrotizing enterocolitis, it was recommended to stop as soon as possible. If the baby was infected, the antibiotics would have been continued.

¶ 104    Dr. Bhat explained that according to the Center for Disease Control (CDC), "late onset" in a diagnosis meant any infection after seven days. Prior to January 4, 2009, there was no mention of meningitis in Marques's records. Babies usually develop late onset GBS from their mothers who are the ones in constant contact with them. Dr. Bhat noted that Denise had contact

- 13 -

with Marques, touching him and changing his diaper. It also could come from other babies in the unit or a nurse handling multiple patients. There have been case reports of GBS transmission through breast milk. The fact that the breast milk tested negative on January 7, 2009, did not indicate that the breast milk prior to that date would have been negative for GBS.

¶ 105     Dr. Bhat opined that Marques's meningitis was late onset based on his recovery from his initial respiratory distress, that he tolerated his feedings, and that he was thriving but suddenly became ill with an infection between the seventeenth and twenty-third days of life. Since Marques did well his first 17 days of life, he could not have been infected in utero. On January 3, 2009, Marques's white blood cell count was low, which indicated an infection. However, between December 14, 2008, and January 2, 2009, his white blood cell count was in the normal range for premature babies. In 40 years of practice, Dr. Bhat had not seen a baby contract a GBS infection in utero, which was suppressed by antibiotics, only to reoccur later.

¶ 106     Dr. Bhat explained that premature babies experience apnea, bradycardis, and desaturation. Poor feeding is common with premature babies. It was routine for premature babies to undergo an ultrasound by 7 to 10 days of life. While increased pressure would indicate brain swelling, Marques's December 23, 2008, ultrasound did not reveal increased pressure. Prior to December 22, 2008, Marques showed no signs of meningitis. While bradycardis and apnea may be signs of infection, the laboratory results by themselves are not conclusive. The laboratory results are considered along with the results of a physical examination. The diagnosis is made based on the overall picture.

¶ 107                              2. Bonnie Flood Chez, RN

¶ 108     Nurse Chez had been an obstetrical nurse for 40 years and testified as to the standard of care applicable to nurse Hughes.

¶ 109     From her review of Denise's WSMC records, nurse Chez concluded that on December 12, 2008, nurse Hughes complied with the standard of care in caring for Denise from the time she was admitted until she was discharged later that morning. WSMC did have a chain of command policy in place. Nurse Chez was familiar with the chain of command policy but noted that it rarely had to be used in clinical practice.

¶ 110     According to nurse Chez, the standard of care did not require nurse Hughes to invoke the chain of command on December 12, 2008. At Denise's first visit to WSMC on December 11, 2008, nurse Hughes had done a thorough assessment of Denise. When Denise returned several hours later, nurse Hughes performed another comprehensive examination. Nurse Chez did not find any confirmation in the record that Dr. Johnson did a digital exam followed by a sterile speculum exam. Dr. Johnson documented that there was no spontaneous rupture of the membrane. Therefore, the standard of care did not require nurse Hughes to invoke the chain of command.

¶ 111     Nurse Chez opined that Denise's membrane was not ruptured when she was at WSMC. She explained that the assessments of Denise's condition were compatible with a patient who has not had a spontaneous rupture of the membrane. In addition, the nitrazine tests performed on December 11 and 12, 2008, were negative. While there was no evidence that the pooling or ferning tests were performed a second time, documentation absences were not necessarily care deficiencies. The data documented in Denise's record supported that the membrane was intact. Denise's discharge from WSMC with the proper instructions was appropriate.

¶ 112    Nurse Chez noted that there was evidence in the record that Drs. Swartz and Diaz were present at WSMC on December 12, 2008. Communications between nurses and doctors could be by telephone or beeper. Once all the data is collected, at a higher level, someone makes the decision to discharge the patient. The record reflected that Drs. Johnson, Swartz, and Diaz were communicating. Dr. Johnson would not have independently made the decision to discharge Denise. Since there was no documentation that Dr. Johnson performed a sterile speculum exam, Ms. Chez could not say for certain one was performed. However, in her best clinical opinion, he did perform the exam.

¶ 113                                3. Larry Severidt, MD

¶ 114    Dr. Severidt was board-certified in family medicine and geriatrics. He practiced family medicine in Iowa where he had delivered over 2000 babies in his 35 years of family practice. He testified as an expert witness to the standard of care applicable to Dr. Johnson. Dr. Severidt noted that Dr. Johnson's residency was in family practice, not obstetrics, but the standard of care was the same for both areas.

¶ 115    The standard of care for ruling out a premature rupture of the membrane required a sterile speculum exam. In his deposition, Dr. Johnson testified that by documenting that the membrane had not ruptured, he had performed the sterile speculum exam. Dr. Severidt concluded that Dr. Johnson had performed the sterile speculum test based on Dr. Johnson's notation that Denise's membrane had not ruptured, which could only have been determined from the sterile speculum exam and the testing of the results. While there was no evidence that Dr. Johnson documented that the pooling or ferning tests were negative, the nursing record showed that the nitrazine test was negative. Dr. Severidt pointed out that Dr. Milik did not document that he performed the sterile speculum exam or that the membrane was not ruptured. He only noted that the results of the tests from the exam were negative.

¶ 116    From the WSMC records, Dr. Severidt noted that Dr. Johnson had performed a digital exam on Denise and recorded the results. The digital exam was necessary to determine if Denise's contractions were causing changes in or opening the cervix. In Denise's case, there were no changes, indicating that her contractions were false labor.

¶ 117    From his review of the WSMC records and Dr. Johnson's deposition testimony, Dr. Severidt opined that Dr. Johnson had complied with the standard of care. Within a reasonable degree of medical certainty, Dr. Severidt opined that Denise's membrane was intact when she was discharged from WSMC at 5:45 a.m. on December 12, 2008. He based his opinion on Dr. Johnson's evaluation of Denise, which resulted in a determination that the membrane had not ruptured. He believed that the rupture of the membrane occurred between her discharge from WSMC and her admission to UIC.

¶ 118    Dr. Severidt opined that the standard of care did not require Denise to be admitted to WSMC rather than discharged. It was within the standard of care for her to be discharged because the membrane had not ruptured and she was not in labor.

¶ 119    Dr. Severidt opined that the communication among and what was communicated to the team, *i.e.*, Drs. Johnson, Diaz, and Swartz and nurse Hughes, met the standard of care. He explained that while Drs. Johnson, Diaz, and Swartz and nurse Hughes had no recollection of being present at WSMC on December 12, 2008, that did not mean that they were not involved in Denise's care. Dr. Severidt further opined that all of the WSMC policies and procedures

were followed in this case. According to him, it was the responsibility of the attending to cosign the discharge note, though on occasion an attending might forget to do so.

¶ 120    Dr. Severidt explained that he instructed his residents to document the tests from the sterile speculum exam, but he also told them that if they put "not ruptured," he would presume that they had done all three tests. It would be a violation of the standard of care if Dr. Johnson's examination of Denise consisted of lifting the sheet covering her, stating that he did not see anything, ignoring her statement that she was "sitting in it," informing her he agreed with the preceding doctor (Dr. Milik), and discharging her. However, Dr. Severidt found no evidence that such an examination took place. It would also have been a violation of the standard of care for Dr. Johnson to discharge Denise without speaking to Dr. Swartz or Dr. Diaz.

¶ 121    Dr. Severidt agreed that Marques likely was infected by Denise in utero. The membrane was ruptured by the time she arrived at UIC in the evening of December 12, 2008. The majority of women who believe they are leaking amniotic fluid are not; the fluid could be vaginal discharge or urine. In the latter case, part of the baby is sitting on the mother's bladder and pushes against it, causing a squirt of fluid.

¶ 122                            4. Suneet P. Chauhan, MD

¶ 123    Dr. Chauhan was an obstetrician-gynecologist with a subspecialty in maternal fetal medicine, which consisted of treating pregnant women with complications.

¶ 124    Questioned about electronic fetal monitor tracing, Dr. Chauhan explained that a fetal heart rate was considered normal between 120 and 160, with the baseline at 150. If a baby is infected, the rate would almost be a straight line above 160, and he had seen it as high as 180 or 200. Where the rate stays above 160 for 10 minutes is called fetal tachycardia.

¶ 125    The December 11 and 12, 2008, fetal tracing records from WSMC showed a pattern of the accelerations which indicated Marques was doing well. At 6 a.m. on December 13, 2008, UIC fetal tracings showed deceleration, *i.e.*, Marques's heart rate was falling. According to Dr. Chauhan, deceleration should be monitored in case the decelerations occur back-to-back. In this case, the deceleration was consistent with the finding of fluid and was caused by the compression of the umbilical cord, and it was reassurance that Marques was doing well. At 8 a.m., the fetal tracings showed that overall Marques had a reasonable heartbeat, between 150 and 160. At 10 a.m., the UIC fetal tracings showed that Marques's heart rate was around 150. There was no evidence of tachycardia or infection. The tracings were continued until delivery and indicated that Marques was doing quite well. Nothing indicated that Marques was not receiving enough oxygen or that he would have a poor outcome. Based on the fetal tracings and Marques's vital signs, there was no evidence that Marques was infected while he was in utero.

¶ 126    Dr. Chauhan explained that the only way for the doctor or the mother to know that the chorio infection was present was if the mother's temperature was at least 100.4 degrees; even at 100.2 degrees, it was not a fever. At 8:20 a.m., on December 13, 2008, Denise had a temperature of 97.8 degrees. Since she did not have a fever at this time, the doctor caring for her would not have known that she had a chorio infection. There is no correlation between clinical chorio and histological chorio, which suggests an infection at the microscopic level.

¶ 127    Dr. Chauhan did not dispute that at the time of Marques's delivery, the environment he had been in contained pus-like fluid. He found it unlikely that Marques had been in pus-filled fluid

for 31 hours. The fetal tracings and his Apgar score would not have been as good; the umbilical artery pH of 7.3 was so good that it would be hard to believe that Marques had been in pus for over 30 hours. The pus-filled fluid was not sent to be tested, and no cultures of the placenta were done.

¶ 128   Within a reasonable degree of medical certainty, Dr. Chauhan opined that the C-section incision was more likely the source of Marques's GBS meningitis. When Denise was discharged on December 16, 2008, her C-section incision was dry and intact. When she returned to UIC on December 26, 2008, the C-section incision site was draining. Denise's temperature and pulse rate indicated that she did not have a fever. The pus from the C-section was tested and revealed the presence of GBS. Dr. Chauhan explained:

> "The skin GBS is more likely to cause the newborn to get it than when a mother has a C-section and GBS was positive in the vagina and the rectum, because the baby never came through the birth canal to be exposed to that."

¶ 129   Dr. Chauhan acknowledged that Denise had not complained that her membrane had ruptured on her December 11, 2008, visit to WSMC. Dr. Chauhan agreed that it would be a violation of the standard of care for Dr. Johnson to discharge Denise without speaking to the fellow or the attending. Having read all of the records, pertinent depositions and testimony, Dr. Chauhan concluded that Dr. Johnson did not violate the standard of care in his treatment of Denise.

¶ 130                              5. Daniel K. Benjamin Jr., MD

¶ 131   Dr. Benjamin testified as an expert in pediatric infectious disease. At the time of trial, he was professor of pediatric infectious disease and pediatrics at Duke University Medical Center in North Carolina. Dr. Benjamin had authored articles on early and late onset meningitis and early and late onset GBS. He had authored and published articles in the area of neonatal meningitis. Dr. Benjamin also reviewed the medical records from WSMC and UIC and the depositions of the lay and expert witnesses.

¶ 132   Based on the depositions, the epidemiology, and the clinical presentation, Dr. Benjamin opined, within a reasonable degree of medical certainty, that Marques suffered late onset of GBS. Dr. Benjamin explained that, in 85% of the cases, early onset of GBS would be seen the first day of life, approximately 10% would be seen in the second day of life, and in some between three and seven days of life. Typically, early onset of disease presented a pneumonia-like picture, bacteria in the blood, and occasionally meningitis or infection in the brain. Late onset was between 7 and 90 days of life, with the peak occurring between 20 and 30 days of life. Late onset usually presents with meningitis first. Early onset can be prevented if the mother is given antibiotics during labor and delivery. In the case of late onset, giving the mother antibiotics would have no impact on late onset of the disease. Giving the baby antibiotics at delivery probably did not impact late onset.

¶ 133   Based on his review of the materials, experience, training, and background, Dr. Benjamin opined that Marques developed late onset meningitis after December 26, 2008. He explained that the blood culture done after delivery and prior to Marques receiving antibiotics, tested negative for bacteria in his blood. Because Denise had a history of chorio, the antibiotics were administered to Marques for five days, a common practice. The antibiotics were stopped on December 17, 2008, but would remain in his system until December 18, 2008. Between December 18, 2008, and January 2 or 3, 2009, Marques's clinical behavior was that of a baby who was not infected. Apnea could occur because of prematurity or infection. In Marques's

case, the timing and number of the episodes of apnea and bradycardia did not indicate Marques was infected. Dr. Benjamin explained that had Marques been infected on December 13, 14, or 15, 2008, and not received sufficient antibiotics, there would have been more episodes of bradycardia. Marques's clinical presentation between December 18, 2008, and the end of December 2008 did not support a finding that he was infected at the time of delivery.

¶ 134    According to Dr. Benjamin, the results of the December 23, 2008, ultrasound were not as significant as the fact that Marques received no antibiotics after December 17, 2008. This was not consistent with a diagnosis of early onset of meningitis. Dr. Benjamin acknowledged that Marques's condition between December 17 and 21, 2008, was inconclusive as to whether he was infected at that time. By December 22, 2008, Marques was taking nasogastric feeds, whereas an infected baby would not want to eat. While Marques had two episodes of emesis, these were insufficient to suspect he was suffering from meningitis. It was not until January 2009, that Marques became very sick and developed late onset of GBS.

¶ 135    Dr. Benjamin explained that the antibiotics Denise and Marques received interrupted the colonization of bacteria, in Marques's case for the first week of life. Because bacteria are on everything, people become colonized with them. Marques could have become colonized with bacteria from contacts with family members, healthcare personnel, or the environment. Once colonized, if the baby is stressed enough, the bacteria could travel from the gut to the brain. While older children's and adults' immune systems fight off infection, babies do not have a developed immune system in the first month of life.

¶ 136    Dr. Benjamin believed that Marques was infected by his contacts with Denise noted on his chart in the days following his birth: cuddling and changing his diaper. Hypothetically, if Marques had received antibiotics, *i.e.*, the correct dose of ampicillin from December 31, 2008, through January 31, 2009, he would not have sustained the injuries he suffered.

¶ 137    Dr. Benjamin maintained that the rupture of Denise's membrane was unconnected to Marques's late onset of meningitis. From a causation standpoint, the fact that Denise was given antibiotics before delivery would not impact late onset GBS. Whether or not the digital exam was appropriate, from a causation standpoint, Dr. Benjamin maintained that the digital exam did not impact late onset GBS.

¶ 138    Dr. Benjamin further maintained that a vertical transmission, *i.e.*, from mother to baby prior to or during delivery, did not occur in this case. Marques was infected via a horizontal transmission, either from a family member or someone providing care in the NICU. The fact that Denise's breast milk tested negative was not relevant. UIC medical records reflected that UIC clinicians diagnosed Marques with late onset GBS.

¶ 139    Dr. Benjamin acknowledged that Marques could have been infected in utero. It was possible that Marques could have both early and late onset of GBS. He acknowledged the existence of partially treated GBS that relapses. Dr. Benjamin maintained that it did not occur in Marques's case.

¶ 140    Dr. Benjamin further maintained that Denise's treatment at WSMC did not cause or contribute to Marques's injuries since she was given antibiotics at UIC before delivery. He did not have and did not express an opinion in his deposition as to whether Denise's membrane ruptured 31 hours prior to delivery.

¶ 141    Dr. Benjamin explained that if Marques had early onset meningitis, there would have been signs of it between 72 and 96 hours of the stoppage of the antibiotics. Compared to the signs

after January 1, 2009, he maintained that the signs documented in Marques's chart, *i.e.*, apnea, bradycardia, diarrhea, poor feeding, and desaturations, were insufficient in number or extent to establish that Marques was suffering early onset of meningitis.

¶ 142    According to Dr. Benjamin, the five days of antibiotics were sufficient to completely eradicate the infection even if meningitis had developed. Assuming there was a tiny pocket of pus remaining, the bacteria would be slow to grow back because they had been exposed to the antibiotics. Between 48 and 72 hours, the bacteria begin to replicate, and the body reacts to the existence of the infection. The baby would then show signs of the infection. He explained that the gowns and gloves do not provide enough protection to prevent colonization of bacteria, leading to infections.

¶ 143                                    IV. Jury Instructions

¶ 144    The plaintiffs submitted their issues instruction (Illinois Pattern Jury Instructions, Civil, No. 20.01 (2011)). The plaintiffs' instruction No. 7 stated in pertinent part as follows:

> "The plaintiff claims that Marques Watson was injured and sustained damage, and that the defendant was negligent in one or more of the following respects:
>
> 1. Failed to properly examine Denise Leonard to rule out preterm premature rupture of membranes;
>
> 2. Failed to perform a sterile speculum exam on Denise Leonard;
>
> 3. Allowed a resident to discharge Denise Leonard without an attending or a fellow countersigning the discharge;
>
> 4. Failed to admit Denise Leonard for observation when it knew or should have known that [she] had premature rupture of membranes';
>
> 5. Failed by its nurse to inform the attending physician that Denise Leonard was being discharged by a resident without a countersignature;
>
> 6. Failed to inform the fellow that Denise Leonard had been discharged by a resident without a counter signature [*sic*];
>
> [7]. Failed by its nurse to inform the fellow that the resident had conducted an improper examination on Denise Leonard."

¶ 145    WSMC submitted instruction No. 4, its issues instruction, stating the plaintiffs' claims of negligence as follows:

> "Failed to properly examine Denise Leonard to rule out preterm rupture of membranes; and/or
>
> Performed a digital exam on Denise Leonard before performing a sterile speculum exam; and/or
>
> Failed to admit Denise Leonard when Dr. Johnson should have known she had premature preterm rupture of membranes."

¶ 146    The trial court instructed the jury with a modified version of WSMC's instruction No. 4, stating the allegations of negligence on the part of WSMC, Dr. Johnson, and nurse Hughes as follows:

> "Failed to properly examine Denise Leonard to rule out premature preterm rupture of membranes; and/or

- 19 -

Performed a digital exam on Denise Leonard before performing a sterile speculum exam; and/or

Failed to admit Denise Leonard when Dr. Johnson knew or should have known she had premature preterm rupture of membranes."

V. Verdict and Posttrial Proceedings

Following deliberations, the jury returned a verdict in favor of WSMC and against the plaintiffs. The trial court denied the plaintiffs' posttrial motion. This appeal followed.

ANALYSIS

I. Trial Court Errors Require a New Trial

The plaintiffs contend that trial court errors denied them a fair trial. The plaintiffs argue that the trial court's rulings on evidence, jury instructions, and courtroom decorum, considered either individually or cumulatively, require that they receive a new trial.

A "trial court will order a new trial if a trial error or an accumulation of trial errors prejudiced a party or unduly affected the trial's outcome." *Dupree v. County of Cook*, 287 Ill. App. 3d 135, 145 (1997). We will review each assertion of error in turn.

A. *Dr. Chauhan's Undisclosed Opinions*

1. Standard of Review

The decision whether to allow an expert to present certain opinions is within the trial court's discretion and will not be disturbed absent an abuse of discretion. *Spaetzel v. Dillon*, 393 Ill. App. 3d 806, 812 (2009). An abuse of discretion will be found only if no reasonable person would take the view adopted by the trial court. *Spaetzel*, 393 Ill. App. 3d at 812.

2. Discussion

The plaintiffs contend that Dr. Chauhan was permitted to testify to undisclosed opinions in violation of Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2018). For a controlled witness such as Dr. Chauhan, WSMC was required to identify, *inter alia*, "the subject matter on which the witness will testify" and "the conclusions and opinions of the witness and the bases therefor." Ill. S. Ct. R. 213(f)(3)(i), (ii) (eff. Jan. 1, 2018).

During direct examination, Dr. Chauhan opined that the care at WSMC did not cause Marques's injury. In addressing the basis for his opinion, Dr. Chauhan testified that the electronic fetal monitoring tracings showed that Marques was not infected. The plaintiffs' attorney objected on the ground that WSMC failed to disclose Dr. Chauhan's opinion that electronic fetal monitoring tracings showed Marques was doing well and showed no signs of infection. After reviewing paragraph 24 of WSMC's disclosure, the trial court overruled the objection.

Paragraph 24 of WSMC's disclosure stated in pertinent part as follows:

"Dr. Chauhan will discuss the fetal monitor tracings, medical records, cord gases, Apgars, placental pathology findings, operative findings, amniotic fluid culture (lack thereof), placental cultures (lack thereof) and mother and baby's course at the time leading up to Marques Watson's delivery and the days after Marques' birth. It is Dr.

Chauhan's opinion that Ms. Leonard's rupture of membranes was not due to her care at [WSMC], which is agreed upon by plaintiff's experts. He will discuss various causes of Ms. Leonard's premature rupture of membranes which occurred after she left [WSMC]."

¶ 160 "Rule 213 is mandatory and strict compliance is required." *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 938 (2000). Compliance with Rule 213 requires not only the disclosure of the specific opinion of the expert witness but the basis for that opinion as well. *Copeland*, 316 Ill. App. 3d at 941. Reversal is proper where a Rule 213 violation affects the outcome of a trial. See *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 382 (2004) (erroneous admission of an undisclosed expert opinion and the trial court's failure to apply the proper remedy to the Rule 213 violation warranted reversal and a new trial).

¶ 161 Dr. Chauhan's Rule 213 disclosure contained the following statement:

"The medical care and treatment rendered to Denise Leonard at [WSMC] complied with the standard of care. The care and treatment rendered to Denise Leonard prior to her presentment at UIC did not cause or contribute to cause any injury to Marques Watson Jr. Marques Watson Jr.'s injuries were as a result of late-onset [GBS] which were neither diagnosable nor preventable by any clinician prior to birth."

¶ 162 An underlying purpose of Rule 213 is to prevent unfair surprise. See *Clayton*, 346 Ill. App. 3d at 377 n.1. WSMC disclosed that Dr. Chauhan would testify that in his opinion Marques was not infected while in the care of WSMC. In paragraph 24, WSMC disclosed that the electronic fetal monitoring tracings were a basis for that opinion. In paragraph 27, WSMC disclosed Dr. Chauhan's opinion that the late onset of GBS was not diagnosable or preventable by a clinician, that he would address the differences between clinical and histological chorio, and that he would address the plaintiffs' witnesses' opinions in that area.

¶ 163 We are satisfied that WSMC's disclosures were sufficient to inform the plaintiffs that Dr. Chauhan would rely on the electronic fetal monitoring tracings as a basis for his opinion that Marques was not infected prior to delivery and that he would refer to the difference between clinical and histological chorio as a basis for his opinion that WSMC's treatment did not cause Marques's late-onset GBS because it could not have been diagnosed or prevented.

¶ 164 The plaintiffs point out that on cross-examination by their attorney, Dr. Chauhan admitted that the Rule 213 disclosures did not state that he would give an opinion that the fetal monitoring tracings showed no infection in Marques. However, during Dr. Chauhan's deposition, the plaintiffs' attorney questioned him as to a note referring to the fetal tracing. Therefore, the plaintiffs may not claim to have been "unfairly" surprised by Dr. Chauhan's testimony that he relied on the fetal monitor tracings in concluding that Marques was not injured by the care Denise received at WSMC. Dr. Chauhan's testimony explained the connection between the fetal monitoring tracings and the existence of an infection in Marques. At the very least, it was a logical corollary to his disclosed opinions. See *Spaetzel*, 393 Ill. App. 3d at 813.

¶ 165 As we noted above, it was within the trial court's discretion to determine whether to allow Dr. Chauhan's opinion testimony into evidence. The record reflects that when the plaintiffs' attorney raised a Rule 213 objection, the trial court reviewed the disclosures to determine whether Dr. Chauhan's opinion on the fetal tracings had been disclosed. Having reviewed paragraph 24 of WSMC's Rule 213 disclosure, the trial court determined that the opinion was admissible. We cannot say that no reasonable person would have ruled as the trial court did.

¶ 166    Moreover, even if error occurred in the admission of Dr. Chauhan's opinion, the fetal tracings were only one area of the evidence presented on the issue of when Marques became infected. We cannot say that it affected the outcome of the trial so as to require reversal and a new trial.

¶ 167    The plaintiffs complain next that Dr. Chauhan improperly opined about the infection in Denise's C-section incision. The trial court sustained the plaintiffs' Rule 213 objection. Nonetheless, the plaintiffs maintain that they were prejudiced because the jury heard the testimony, which was contrary to Dr. Chauhan's deposition testimony. But their attorney could not cross-examine Dr. Chauhan on his deposition testimony without highlighting his undisclosed opinion.

¶ 168    Where a violation of Rule 213's disclosure requirements has occurred, the aggrieved party may move for sanctions, such as striking only the testimony violating the rule, striking the witness's entire testimony and barring the witness from testifying further, or declaring a mistrial. *Clayton*, 346 Ill. App. 3d at 378. The court has the discretion to fashion the appropriate remedy, ensuring that the sanction allows for a fair trial rather than punishing the party that committed the violation. *Clayton*, 346 Ill. App. 3d at 378.

¶ 169    The plaintiffs did not request that the trial court impose a sanction or even request that the testimony be stricken and the jury admonished to disregard the testimony. See *Magna Trust Co. v. Illinois Central R.R. Co.*, 313 Ill. App. 3d 375, 395 (2000) ("Although the prejudicial effect of an improper argument cannot be erased from the minds of jurors by an admonishment from the court, the act of properly sustaining an objection and instructing the jury to disregard such argument has usually been viewed as sufficient to cure any prejudice."). Moreover, "[a] party may not urge a trial court to follow a course of action, and then, on appeal, be heard to argue that doing so constituted reversible error." *Forest Preserve District v. First National Bank of Franklin Park*, 2011 IL 110759, ¶ 27.

¶ 170    In sum, we conclude that the trial court did not abuse its discretion in its rulings on the plaintiffs' Rule 213 objections. We further conclude that, by failing to request that the trial court impose a sanction for the Rule 213 violation, the plaintiffs waived their right to complain that they were prejudiced.

¶ 171                    B. *Reference to Denise's Abortion*

¶ 172    Prior to trial, the trial court granted the plaintiffs' motion *in limine* barring reference to an abortion Denise underwent prior to her pregnancy with Marques. The court ordered that all references to her abortion be redacted.

¶ 173    During the direct examination of defense expert, Dr. Severidt, an exhibit displaying the report of the paramedics who transported Denise to WSMC on December 12, 2008, was displayed before the jury. Contrary to the trial court's order, the word "abortion" had not been redacted. The plaintiffs' attorney immediately requested that the exhibit be taken down and requested to be heard outside the presence of the jury.

¶ 174    The trial court and the attorneys discussed various remedies to cure the error. The plaintiffs' attorney requested that the entire line in which the word "abortion," appeared be taken out. The trial court agreed, and the line was removed. The following colloquy took place:

"THE COURT: Okay. Now, it does not appear from looking at the document as though there was anything missing that was there before; would you agree with that, Mr. Ford?

MR. FORD: That's fine.

THE COURT: Okay.

MR. FORD: And that's what we were supposed to do.

THE COURT: Right. We've been over that. And I told you—

MR. FORD: Okay. I am going to stop."

The trial continued before the jury with the redacted exhibit.

¶ 175    In ruling on the plaintiffs' posttrial motion, the trial court pointed out that the word "abortion" was not testified to or used by anyone. While the plaintiffs' attorney disagreed, the court recalled the exhibit was taken down a "split second" after he requested it. The plaintiffs' attorney also noted that his request that the exhibit not be used at all was denied. He acknowledged that he did not ask for a mistrial.

¶ 176                              1. Standard of Review

¶ 177    We review a trial court's ruling on a violation of a motion *in limine* for an abuse of discretion. See *Magna Trust Co.*, 313 Ill. App. 3d at 396 (holding that the trial court did not abuse its discretion by denying a motion for mistrial for a violation of a motion *in limine*). Violation of a motion *in limine* is not *per se* reversible error in the absence of substantial prejudice to the party. *Magna Trust Co.*, 313 Ill. App. 3d at 396.

¶ 178                                 2. Discussion

¶ 179    The plaintiffs maintain that they were seriously prejudiced by the violation of the motion *in limine*. They argue that the issue of abortion, though constitutionally protected, is still to some individuals the taking of human life and/or immoral. In their posttrial motion, the plaintiffs cited an August 15, 2013, report from the Pew Research Center, "Abortion Viewed in Moral Terms: Fewer See Stem Cell Research and IVF as Moral Issues." According to the report, one out of two jurors carried personal beliefs that would cause them to conclude that Denise acted immorally in having an abortion. They further argue that, had the motion *in limine* not been granted, they would have questioned prospective jurors regarding their views on abortion.[5] Finally, the plaintiffs maintain that the violation appeared to be deliberate on WSMC's part.

¶ 180    Whether inadvertent or deliberate, the only way the violation of the motion *in limine* could have caused prejudice to the plaintiffs was if the jury actually saw the word "abortion," in connection with Denise. While how quickly events occur cannot be gleaned from the cold record, we have the trial court's description of the event as it unfolded. As the impartial observer of these events, its recollection that the exhibit with the offending word was on

---

[5] Three weeks after the jury's verdict, the plaintiffs' attorney received an anonymous letter addressed to his wife and him containing antiabortion rhetoric. The couple had not previously been the recipient of such material. The plaintiffs acknowledge that this incident cannot be tied into the events of this case, but they maintain it was an indication of the existence of strong feelings about abortion.

display for a "split second" makes it unlikely that the jury observed the word and understood its context with regard to Denise.

¶ 181 The fact that the plaintiffs' attorney did not immediately move for a mistrial suggests that only in hindsight did the violation rise to the level of prejudice the plaintiffs now assert. While the trial court did not choose to remedy the violation by not using the exhibit or by using it with another witness, as requested by the plaintiffs' attorney, we find no abuse of discretion in the trial court's redaction order to remedy the violation.

¶ 182                                       C. *Issues Instruction*

¶ 183 The plaintiffs contend that the trial court erred when it refused to instruct the jury on their theory of the case. The plaintiffs maintain that their theory at trial was that Dr. Johnson never performed a sterile speculum exam on Denise. However, the issues instruction given to the jury provided that Dr. Johnson performed a digital exam on Denise before performing a sterile speculum exam on her. The plaintiffs further argue that the modified issues instruction failed to instruct the jury on their allegations of negligence against nurse Hughes.

¶ 184                                       1. Standard of Review

¶ 185 "Whether to give or deny a jury instruction is within the trial court's discretion." *Stapleton v. Moore*, 403 Ill. App. 3d 147, 163 (2010). Likewise, whether the evidence at trial raised an issue requiring a particular jury instruction is within the trial court's discretion. *Stapleton*, 403 Ill. App. 3d at 163.

¶ 186                                       2. Discussion

¶ 187 At the jury instructions conference, the following colloquy occurred:

"THE COURT: Okay, [WSMC's] Jury Instruction No. 4, 20.01 as modified, please look at it. Everyone either agrees to it or tell me what you object to on the record.

MR. FORD: I thought we were going to put something about the chain of command in here.

THE COURT: You didn't offer anything on the chain of command.

* * *

THE COURT: I believe this. I do not believe that there is any evidence that the failing to go up the chain of command itself caused any injury to Marques.

However, what did the failure to go up the chain of command result in? It resulted in, in your view, the failure to stop him in his tracks because, of course, the first line of chain of command behavior was to stop Dr. Johnson, and that's here, that he did what he did, and that's what injured the child, in your theory. And the failure to go up the chain of command to keep the plaintiff from being discharged resulted in the wrong discharge in your theory.

MR. FORD: In other words, this is all incorporated under [the plaintiffs' instruction No. 3]?

THE COURT: It is. There is no separate failure to go up the chain of command. No proximate cause of anything.

MR. FORD: I see what you are saying."

¶ 188    "[A] litigant waives the right to object on appeal to instructions or verdict forms that were given to the jury, when the party fails to make a specific objection during the jury instruction conference or when the form is read to the jury." *Baumrucker v. Express Cab Dispatch, Inc.*, 2017 IL App (1st) 161278, ¶ 63. In this case, the trial court requested that the parties raise any objections on the record to WSMC's modified instruction No. 4. The only objection the plaintiffs' attorney raised was the lack of reference to the chain of command. After further discussion, the plaintiffs' attorney agreed with the trial court that the chain of command allegation was covered in another jury instruction and abandoned any objection to the modified issues instruction.

¶ 189    Based on the discussion quoted above between the trial court and the plaintiffs' attorney, we conclude that the plaintiffs waived their right to object to the issues instruction given to the jury.

¶ 190                                D. *The Handshake Exchange*

¶ 191    Prior to the commencement of closing argument, the trial court held a discussion with the parties' attorneys regarding an incident that occurred at the end of Dr. Benjamin's testimony. The trial judge explained that Dr. Benjamin had shaken her hand as he left the witness stand and said something to her, which she did not believe the jury heard. The judge felt it was "very inappropriate, but it happened so fast that I just reacted like a normal person would when someone would shake your hand." The judge was "not sure what the jury might have taken from it, and since it made me uncomfortable, that means it could have made—did it make you uncomfortable?"

¶ 192    The plaintiffs' attorney acknowledged that he witnessed the handshake and that he thought it was unusual. The trial court stated that she would leave the response up to the plaintiffs' attorney and do whatever he asked. The plaintiffs' attorney responded as follows:

> "MR. FORD: I think at this point why don't we just—
> THE COURT: Let it go.
> MR. FORD: —let it go."

¶ 193                                1. Standard of Review

¶ 194    "A judge's conduct and remarks in the presence of a jury will not warrant a reversal unless they are such as would ordinarily create prejudice in the minds of the jurors." *Pavilon v. Kaferly*, 204 Ill. App. 3d 235, 251 (1990).

¶ 195                                2. Discussion

¶ 196    WSMC argues that the plaintiffs waived any error in connection with the handshake exchange between Dr. Benjamin and the trial judge. As we previously noted, "[a] party may not urge a trial court to follow a course of action, and then, on appeal, be heard to argue that doing so constituted reversible error." *First National Bank of Franklin Park*, 2011 IL 110759, ¶ 27. In this case, outside the presence of the jury, the trial judge placed on the record the fact that Dr. Benjamin unexpectedly shook her hand as he left the witness stand. Uncertain as to what the jury might have implied from the handshake, the trial judge left the decision as to how to deal with the conduct with the plaintiffs' attorney. The plaintiffs' attorney made the decision not to make any more of the incident but to " 'let it go.' "

¶ 197     The plaintiffs respond that they were placed in a "no win" situation because the other alternative, *i.e.*, an instruction to the jury, would have highlighted the incident in the minds of the jury. They maintain that Dr. Benjamin was a critical witness for WSMC's argument that its conduct was not the cause of Marques's injuries. Therefore, the show of friendliness between the trial judge and Dr. Benjamin prejudiced the plaintiffs' ability to obtain a fair trial. Waiver aside, we find the exchange of handshakes between the trial judge and Dr. Benjamin did not so prejudice the plaintiffs in the minds of the jury that a new trial is required.

¶ 198     "[A] trial judge should refrain from conveying to the jury his or her opinions on ultimate matters of fact or the credibility of the witnesses and the weight to be given their testimony." *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 127 (1997). In cases where the trial judge's conduct was so prejudicial that reversal and remand for a new trial was required, the conduct was repetitive or combined with other errors. In *Holton*, outside the presence of the jury, the plaintiffs' counsel accused a defense witness of perjury. Just before closing argument, the trial judge read a statement to the jury informing it that he had determined that the witness's testimony was untrue and that defense attorneys knew the testimony was false but had encouraged the witness to believe the statement was true. The trial judge instructed the jury that they could take that fact into consideration in determining the credibility of the witness's testimony. The prejudicial impact was heightened when immediately following the judge's statement, the plaintiffs' attorney's closing argument was riddled with references to "coached and deceitful hospital witnesses and manipulative attorneys." *Holton*, 176 Ill. 2d at 127-28.

¶ 199     In *Pavilon*, the trial judge's excessive admonishments to the *pro se* plaintiff, his misconstruction of a witness's testimony, his improper criticism of one of the plaintiff's witnesses, and his comments on the evidence cumulatively were sufficient to create prejudice in the minds of the jurors. *Pavilon*, 204 Ill. App. 3d at 256.

¶ 200     In the present case there was no repetitive prejudicial conduct by the trial judge, and it was not a situation where the judge's conduct combined with other errors to so prejudice a party that a new trial was required. Moreover, the plaintiffs' attorney did not seek a mistrial, a third alternative available to him and one which would not have required him to draw the jury's attention to the complained-of conduct.

¶ 201     In sum, the plaintiffs chose not to pursue the matter of the trial court's response to Dr. Benjamin's handshake, thus waiving any error. Even on the merits, the trial judge's conduct was not so prejudicial so as to require new trial. Since no error occurred, we need not engage in the plain error analysis requested by the plaintiffs in their reply brief.

¶ 202                              E. *Error in Barring Cumulative Testimony*
¶ 203                              1. Standard of Review
¶ 204     "A trial court has discretion to exclude cumulative evidence, and a ruling in this regard will not be reversed unless the trial court abuses its discretion." *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, ¶ 77. An abuse of discretion will be found only if the trial court acted arbitrarily, did not employ conscientious judgment, the ruling exceeded the bounds of reason and ignored recognized principles of law, or if no reasonable person would take the position adopted by the court. *Payne v. Hall*, 2013 IL App (1st) 113519, ¶ 12.

¶ 205                                    2. Discussion

¶ 206    The plaintiffs contend that the trial court erred by requiring them to choose between presenting the testimony of Dr. Crawford, their neonatology expert, and Dr. Correa, their infectious disease expert, on the ground that their testimony was cumulative. The plaintiffs further contend they were prejudiced by the error because they had the burden of proof and because WSMC's neonatology and infectious disease experts were permitted to testify. The plaintiffs' contentions are not supported by the record.

¶ 207    The trial court may exercise its discretion to limit the number of expert witnesses a party may present. *Steele*, 2013 IL App (3d) 110374, ¶ 77. The trial court took into consideration that Dr. Correa and Dr. Gurewitsch might have "slightly different testimony about causation, all the business about [GBS] and the time it takes to incubate *** all of that might be something that the [infectious disease] person would address in more detail. And that's going to be up to you." After ascertaining that Dr. Correa would have some criticisms about the way the antibiotics were or were not managed, the court stated, "[t]hose are the things they can testify to if they said them before." The plaintiffs' attorney acknowledged that as long as Dr. Gurewitsch's testimony covered all of Dr. Johnson's deviations from the standard of care, "then I don't need to do it through anybody else."

¶ 208    Contrary to the plaintiffs' contention, the granting of WSMC's motion *in limine* did not require the plaintiffs to forego calling Dr. Correa as a witness. The trial court did not bar Dr. Correa from testifying. Rather, the trial court barred identical testimony by the expert witnesses as to causation. Since the expert witnesses disclosed by the plaintiffs would present identical testimony as to causation, the trial court merely required that the plaintiffs choose which witness would present that testimony.

¶ 209    In sum, no error occurred because the grant of WSMC's motion *in limine* did not bar Dr. Correa from testifying. The trial court did not abuse its discretion in requiring the plaintiffs to choose through which witness testimony as to causation would be presented.


¶ 210                                 F. *Rebuttal Testimony*
¶ 211                                1. Standard of Review
¶ 212    Where, as in the present case, the circuit court's ruling on a discovery matter is subject to review and does not involve a question of law, it is reviewed for an abuse of discretion. *Doe 1 v. Board of Education of the City of Chicago*, 2017 IL App (1st) 150109, ¶ 14.


¶ 213                                    2. Discussion
¶ 214    The plaintiffs contend that the trial court erred when it restricted them from presenting the rebuttal testimony of Dr. Barry Schifrin. The plaintiffs forfeited this error by failing to provide citations to authority in support of their claim of error. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2017). Absent forfeiture, the record does not support their contention that they were forced to choose between presenting Dr. Kilpatrick's testimony and Dr. Schifrin's rebuttal testimony.

¶ 215    Judge Brosnahan found that the plaintiffs' decision to take Dr. Kilpatrick's evidence deposition before disclosing their rebuttal witness's testimony was unfair and unduly prejudicial. In order to remedy the situation, Judge Brosnahan proposed that Dr. Kilpatrick's evidence deposition be stricken, and the parties redepose her after Dr. Schifrin's deposition was completed. Judge Brosnahan ordered Dr. Kilpatrick's evidence deposition to be stricken

unless the plaintiffs withdrew Dr. Schifrin's disclosure. The plaintiffs withdrew Dr. Schifrin as a rebuttal witness.

¶ 216    Judge Brosnahan's order did not require the plaintiffs to forego the testimony of either Dr. Kilpatrick or Dr. Schifrin. Nonetheless, the plaintiffs argue that redeposing Dr. Kilpatrick, who resided in California, would have caused conflicts in scheduling other discovery matters, and the trial date was approaching. There is no indication that the plaintiffs sought but were denied a continuance of the trial date in order to retake Dr. Kilpatrick's evidence deposition. In short, the plaintiffs fail to explain why it was impossible to retake Dr. Kilpatrick's evidence deposition, which then would have allowed them to present the testimony of both doctors.

¶ 217    "To resolve discovery disputes, courts must strike the proper balance between competing interests." *Hilgenberg v. Kazan*, 305 Ill. App. 3d 197, 204 (1999). "The objectives of discovery include enhancing the truth-seeking process, enabling attorneys to better prepare and evaluate their cases, eliminating surprises, ensuring that judgments rest upon the merits of the case, among others." *Hilgenberg*, 305 Ill. App. 3d at 204-05.

¶ 218    Judge Brosnahan's January 29, 2016, order was in keeping with the objectives of discovery and did not require the plaintiffs to forgo the expert testimony of either Dr. Kilpatrick or Dr. Schifrin. We find no abuse of discretion.

¶ 219                    G. *Alteration of Denise's WSMC Record*
¶ 220                        1. Standard of Review
¶ 221    We will reverse the trial court's ruling on an evidentiary matter only where the court has abused its discretion. *Gunn v. Sobucki*, 352 Ill. App. 3d 785, 789 (2004).

¶ 222                            2. Discussion
¶ 223    The plaintiffs contend that the trial court erred when it sustained WSMC's objections to their questions on the alteration of the record and ordered them not to comment on the altered record in closing argument. They maintain that nurse Hughes's alteration of the medical record went to her credibility.

¶ 224    The plaintiffs forfeited the claimed error as they failed to cite the pages of the record they rely on to support their argument. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2017); see also *Adami v. Belmonte*, 302 Ill. App. 3d 17, 26 (1998) (the plaintiff forfeited her claim on appeal that the trial court erred in restricting her closing argument where she failed to cite that portion of the record wherein the court barred the plaintiff from commenting on the failure of certain witnesses to testify). In any event, the trial court did not abuse its discretion.

¶ 225    At the commencement of the lawsuit, the plaintiffs received copies of Denise's medical records from WSMC reflecting that Denise was tested for GBS and the results were negative. Prior to trial, the plaintiffs received the original records, wherein the line for the GBS test results was blank. It was uncontested at trial that Denise was not tested for GBS while at WSMC. Nonetheless, the plaintiffs maintain that they were entitled to introduce evidence of the alteration, as it reflected on nurse Hughes's credibility.

¶ 226    During the testimony of nurse Hughes, the plaintiffs' attorney questioned her as to the alteration to Denise's December 12, 2008, WSMC medical record. Nurse Hughes acknowledged that she had altered the original record, which left blank the space for the GBS test result. While she intended to correct it to "unknown," she accidently clicked "negative"

instead and did not realize her mistake. On cross-examination, nurse Hughes explained that she did not want to leave the GBS test result "blank," and acknowledged she made a mistake in entering "negative."

¶ 227    The trial court has the discretion to bar comments made during closing argument that are speculative. *People v. Maldonado*, 402 Ill. App. 3d 411, 429 (2010). Where a trial court limited the scope of closing argument, we will reverse only if the court abused its discretion. *Maldonado*, 402 Ill. App. 3d at 429.

¶ 228    Nurse Hughes acknowledged on direct examination and cross-examination that she altered Denise's December 12, 2008, record. She explained that she preferred not to leave the space for the GBS test blank. Her intention was to insert "unknown," but she entered "negative" by mistake. Neither the trial evidence nor a reasonable inference therefrom supports the plaintiffs' claim that nurse Hughes's admitted alteration of Denise's medical record was a "falsification" intended to cover-up the fact that Denise's membrane had ruptured at the time she was seen by Dr. Johnson at WSMC on December 12, 2008.

¶ 229    The plaintiffs' argument is purely speculative, and therefore, the trial court did not abuse its discretion in barring comment in closing argument as to nurse Hughes's motive in altering the record. Moreover, the jury heard nurse Hughes acknowledge that she did not recall Denise or the events of December 11 or 12, 2008. The jury also heard her testimony that she made a mistake when she altered the record. Nurse Hughes's testimony that she had no recollection of those events, yet did recall that she made a mistake in altering the record, was sufficient to raise a question of her credibility in the minds of the jury.

¶ 230    We conclude that the plaintiffs forfeited the error. Even considering the merits, we find no abuse of discretion on the part of the trial court.

¶ 231                        II. Manifest Weight of the Evidence

¶ 232    The plaintiffs contend that they are entitled to a new trial because the jury's verdict in favor of WSMC was against the manifest weight of the evidence.

¶ 233                        A. *Standard of Review*

¶ 234    "[A] reviewing court may reverse a jury verdict only if it is against the manifest weight of the evidence." *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003). "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence." *Snelson*, 204 Ill. 2d at 35. As the reviewing court, we may not simply reweigh the evidence and substitute our judgment for that of the jury. *Snelson*, 204 Ill. 2d at 35.

¶ 235                        B. *Discussion*

¶ 236    In order to prevail in an action for medical malpractice, the plaintiff must show "(1) the standard of care in the medical community by which the physician's treatment was measured; (2) that the physician deviated from the standard of care; and (3) that a resulting injury was proximately caused by the deviation from the standard of care." *Johnson v. Ingalls Memorial Hospital*, 402 Ill. App. 3d 830, 843 (2010).

¶ 237    The plaintiffs maintain that there was overwhelming evidence that Dr. Johnson violated the standard of care by failing to do a sterile speculum exam to determine if Denise's membrane

had ruptured, by performing a digital exam that was contraindicated where a rupture of the membrane was suspected, and by discharging Denise without obtaining the consent of the attending or fellow. The plaintiffs further maintain that the undisputed evidence and the testimony of the witnesses, lay and expert, established that Dr. Johnson's violation of the standard of care was a proximate cause of the infection Marques acquired and led to his injury. On the other hand, WSMC presented evidence through its lay and expert witnesses that disputed the plaintiffs' allegations that Dr. Johnson's conduct violated the standard of care and that, in any event, the infection Marques suffered was not proximately caused by the actions of Dr. Johnson or nurse Hughes.

¶ 238    Not surprisingly, the parties' expert witnesses presented conflicting testimony. The evidence in this case is perhaps best described as a " 'classic battle of the experts.' " *Snelson*, 204 Ill. 2d at 36 (quoting *Snelson v. Kamm*, 319 Ill App. 3d 116, 145 (2001)).[6] Quoting the appellate opinion in *Snelson*, the supreme court further stated:

> " 'Witnesses qualified in their fields stated their opinions and gave their reasons for those opinions. Not surprisingly, the plaintiff's experts did not agree with the defense experts. The jury needed to listen to the conflicting evidence and use its best judgment to determine where the truth could be found. The jury found in favor of Snelson and against Kamm, and this court "should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." ' " *Snelson*, 204 Ill. 2d at 36 (quoting *Snelson*, 319 Ill. App. 3d at 145, quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53 (1992)).

¶ 239    The evidence in this case did not "overwhelmingly" favor either the plaintiffs or WSMC. Moreover, as our recital of the trial evidence demonstrates, it was far from undisputed. "It is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide the weight to be given to the witnesses' testimony." *Larkin v. George*, 2016 IL App (1st) 152209, ¶ 19. In this case, each party presented evidence, both lay and expert, which if believed by the jury, would support a verdict in its favor. Based on the record in this case, we cannot say that the verdict in favor of WSMC was against the manifest weight of the evidence.

¶ 240                                   CONCLUSION
¶ 241    For all of the foregoing reasons, the judgment of the trial court is affirmed.

¶ 242    Affirmed.

---

[6]The supreme court reversed the appellate and circuit court judgments granting a new trial to defendant Kamm and remanded for reinstatement of the jury's award to the plaintiff. The court affirmed the appellate and circuit court granting judgment *n.o.v.* to defendant St. Mary's Hospital of Decatur. *Snelson*, 204 Ill. 2d at 50.